STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Roshawn SMITH,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2010AP1192–CR. Oral argument March 13, 2012.
—Decided July 12, 2012.*

2012 WI 91

(Also reported in 817 N.W.2d 410.)

713

714

715

For the defendant-appellant-petitioner, there were briefs and oral argument by *William E. Schmaal,* assistant state public defender.

For the plaintiff-respondent-petitioner, the cause was argued by *Sally Wellman,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

¶ 1. MICHAEL J. GABLEMAN, J. We review an unpublished decision of the court of appeals[1] reversing the Brown County Circuit Court's judgment of conviction against Roshawn Smith ("Smith").[2] The State charged Smith with being a party to the crime of possession with intent to deliver more than 10,000 grams of tetrahydrocannabinol ("THC"[3]) in violation of Wisconsin Statutes section 961.41(1m)(h)5. (2005–06)[4]

---

[1] *State v. Smith,* No. 2010AP1192–CR, unpublished slip op. (Wis. Ct. App. May 26, 2011).

[2] The Honorable Sue E. Bischel presiding.

[3] THC is the active ingredient in marijuana. *State v. Buchanan,* 2011 WI 49, ¶ 6, 334 Wis. 2d 379, 799 N.W.2d 775.

[4] Wisconsin Statutes section 961.41(1m) provides:

[I]t is unlawful for any person to possess, with intent to manufacture, distribute or deliver, a controlled substance . . . . Any person who violates this subjection is subject to the following penalties:

(h) [THC]. If a person violates this subsection with respect to [THC] . . . and the amount possessed, with intent to manufacture, distribute, or deliver, is: . . .

5. More than 10,000 grams . . . , the person is guilty of a Class E felony.

A Class E felony is punishable by a term of imprisonment no greater than 15 years. § 939.50(3)(e).

All subsequent references to the Wisconsin Statutes are to the 2005–06 version.

and 939.05.[5] Smith stipulated to the fact that the packages seized by the police contained more than 10,000 grams of THC. At the conclusion of the evidentiary portion of the jury trial but prior to the jury's deliberations, the circuit court answered a verdict question for the jury concerning the weight of the drugs. The jury found Smith guilty of the offense of being a party to the crime of possession with intent to deliver more than 10,000 grams of THC. He was sentenced to a period of incarceration of six years initial confinement and five years extended supervision.

¶ 2. Two issues are presented for our consideration: 1) whether the evidence was sufficient to support Smith's conviction; and 2) whether Smith waived his right to a jury determination on the quantity of the drugs. Because a reasonable inference of Smith's guilt could have been drawn by the jury from the evidence presented at trial, viewed in its entirety, we hold that the evidence was sufficient to sustain the conviction and agree with the court of appeals' decision in that regard. Second, while we determine that Smith had a constitutional right to a jury determination of the drug quantity, and although the circuit court determined

---

[5] Wisconsin Stat. § 939.05 provides:

(1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not commit it . . . .

(2) A person is concerned in the commission of the crime if the person:

 (a) Directly commits the crime; or

 (b) Intentionally aids and abets the commission of it; or

 (c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it.

that question without eliciting from Smith a proper waiver of that right, we conclude the error was harmless because it is clear beyond a reasonable doubt that a properly instructed, rational jury would have found Smith guilty of the charged offense absent the error. The court of appeals therefore erred in remanding the cause to the circuit court. Accordingly, we reverse the court of appeals and reinstate the guilty verdict and judgment of conviction.

## I. BACKGROUND

¶ 3. In 2006, law enforcement officers in Brown County, Wisconsin were alerted by a police officer in California that suspicious packages were being sent via Federal Express ("FedEx") from that state to Brown County. As a result of that information, two packages were seized by local law enforcement officers from FedEx in Brown County and 22,477 grams of marijuana, testing positive for THC, were discovered therein. On September 20, 2006, Brown County law enforcement agents, dressed as FedEx employees, delivered the packages to the home in Brown County to which they were addressed. Upon delivery, Shannon Kortbein ("Kortbein") came to the door, received the packages, and signed for them. Shortly thereafter, officers observed a man later identified as Terri[6] Thomas ("Thomas") approaching the residence and arrested him.

¶ 4. Further investigation led law enforcement to suspect Smith's involvement in the drug offense. Pursuant to that investigation, the State filed a criminal information against Smith, alleging that on September 20, 2006 he possessed with intent to deliver, as a party

---

[6] Although Thomas is occasionally referred to in the record as "Terry," the State and Smith both spell the name "Terri," as did the court of appeals.

to the offense, more than 10,000 grams of THC, a Class E Felony punishable by up to 15 years in prison. Wis. Stat. § 939.50(3)(e).

¶ 5. The matter was set for trial. At a pretrial hearing held on March 6, 2008, defense counsel informed the circuit court that he believed his client "would be prepared to stipulate" to a chemist's report that more than 10,000 grams of THC were seized from the packages delivered to Kortbein's home. The circuit court then held the following colloquy with Smith:

> THE COURT: Mr. Smith, . . . [defense counsel] says that you're prepared to agree that the stuff that was found in the boxes was marijuana, THC. The State has a crime lab analyst subpoenaed to testify that the substance was tested and that it is in fact [THC], marijuana . . . . And that [defense counsel] is telling me you are not going to make that person drive here from the crime lab to say that. That you will agree to that analyst's report. That is not your defense. Your defense is not that it is not marijuana. Your defense is that you had nothing to do with it being there. Is that true?
>
> ROSHAWN SMITH: Yes, ma'am.
>
> THE COURT: You don't want to have that crime lab person come up here?
>
> ROSHAWN SMITH: No.
>
> THE COURT: Okay. Any promises or threats made to you to get you to make that decision?
>
> ROSHAWN SMITH: No, ma'am.
>
> THE COURT: Okay. You are not disputing that it's marijuana . . . . [Y]our position is you didn't have anything to do with it, is that right?
>
> ROSHAWN SMITH: Yes.

¶ 6. A similar but less extensive exchange took place at a subsequent pretrial hearing held on September 19, 2008:

[DEFENSE COUNSEL]: It's my client's understanding, and I talked it over with him again just prior to our hearing today, that the lab tech would be stipulated to. We're not contesting what was ultimately found in the boxes.

THE COURT: He just contests his involvement?

[DEFENSE COUNSEL]: We're not contesting anything about the deliveries or anything about what was in the boxes or how the testing came out or the evidence [of] that nature.

THE COURT: Is that true, Mr. Smith? You're not going to make the State prove what was in the boxes?

MR. SMITH: No.

¶ 7. At yet another pretrial hearing, held on September 30, 2008, both attorneys and Smith signed a stipulation indicating that the seized material "was identified to have the presence of [THC], a substance from marijuana and weighed 22,477 grams."

¶ 8. During pretrial proceedings held on the day of trial, the circuit court informed Smith that it "need[ed] to ask you personally, you agree that the crime lab person doesn't need to come to testify about the fact that what's in the bag contains THC, which is the active ingredient in marijuana? That is your agreement?" Smith responded, "I believe so." Shortly thereafter, the circuit court made the following comments to Smith:

[I]t is my understanding that your defense is you didn't have anything to do with this, you knew nothing about it, you weren't involved . . . . And . . . because your defense is you didn't have anything to do with it, and to

> drag the crime lab person in here to testify that it was marijuana isn't part of your defense. And I just wanted to be sure that you understand that you agreed with that. You signed it. I would fully expect that [defense counsel] explained it to you. But I just wanted to be sure that you understood that. Because it's not part of your defense, there is no reason to drag this crime lab person in here to say it was marijuana.

Smith answered, "I agree." Also on the day of trial, the prosecutor informed the court that "the State would be requesting that at the conclusion of the State's case, . . . the Court would read the stipulation to the jury and have it entered into the record." Defense counsel agreed that that would be appropriate.

¶ 9. During the court's opening instructions to the jury, it related that the State intended to argue that Smith could be found guilty of being a party to the crime under any of the three alternative types of liability set forth by Wis. Stat. § 939.05: direct commission, aiding and abetting, or conspiracy.

¶ 10. After trial had begun, a law enforcement officer began testifying about testing the packages for THC and defense counsel objected on the grounds that it was unnecessary as a result of the stipulation. The court then informed the jury that

> the State and the Defense have stipulated that various substances that you are going to hear testified to in this case, and this is one of them, have tested positive for the presence of [THC], a substance from marijuana. And they have stipulated that in addition to the field testing that was done . . . , that it was tested later by a lab analyst . . . . So, they've stipulated to that and I will direct you to find that as a fact.

¶ 11. Following the testimony of several law enforcement officers, the State called Kortbein. She stated

that she had known Smith[7] for approximately three and a half years. Asked how she came to be involved in the package delivery, Kortbein answered that Smith introduced her to Thomas, and, she believed, Smith then gave Thomas her cell phone number. Thomas called her in the summer of 2006 and asked if she would be willing to have packages sent to her home in return for $500 per package. She agreed and, over the next few weeks, received three shipments similar to those that were later seized by law enforcement. After each delivery, Thomas retrieved the package from Kortbein within a few days and Smith paid her $400[8] within a few days after Thomas picked up the package.

¶ 12. Later in the trial, David Mehlhorn ("Mehlhorn") took the stand. He testified that he had agreed to receive packages at his home at Smith's behest. Mehlhorn further testified that he subsequently received approximately three packages from California during the summer and fall of 2006. After each arrived, he would call Smith and Smith and Thomas would pick them up. During his direct examination, the following exchange occurred between Mehlhorn and the attorney representing the State:

Q. Now, did [Smith] ever talk to you about being involved with a marijuana thing with a girl?

A. After it became public, yes.

Q. But did he tell you it was going to be fine?

---

[7] Kortbein testified that she knew Smith by the name of "Frog," a name (in addition to "Froggy") by which other witnesses also knew him. For the sake of simplicity, we will refer to Smith by his real name even where the record reflects that the names "Frog" or "Froggy" were used at trial.

[8] The record does not resolve the discrepancy between the promised $500 and the $400 Kortbein testified she actually received.

A. Yes . . . .

Q. Why did he think it would be fine?

A. Because it was his word against hers.

¶ 13.　Sergeant David Poteat ("Sergeant Poteat") of the Brown County Sheriff's Department also testified for the State. While on the stand, he stated that he had reviewed Smith's, Kortbein's, and Thomas's telephone records and found "numerous telephone calls" between them from July through September 2006, and a particularly large cluster of calls right around the days the parcels arrived and were picked up. Analyzing this data, Sergeant Poteat opined that "the pattern of the calls [was] consistent with . . . the courier relationship."

¶ 14.　During trial, the circuit court read the stipulation to the jury. It also advised the jurors that a lab report was attached to the stipulation and would be marked as an exhibit. The lab report, it added, listed all of the seized drugs, which "total[ed] 22,477 grams."

¶ 15.　The State rested and defense counsel declined to present any evidence. The circuit court brought up the issue of jury instructions and the prosecutor reiterated that she "had originally requested that that stipulation be read to the jury." Asked for his views on the matter, defense counsel stated that he too "would rather . . . have [the stipulation] read" to the jury. The circuit court then agreed with the attorneys that it would read the stipulation to the jury. As the conversation moved to the content of the instructions, defense counsel remarked, "we don't really need the weight on the verdict for guilty, because we've already stipulated to what the weight is. The jury doesn't need to make a finding." In response, the prosecutor told the court "[t]here is still suppose[d] to be a finding, Your Honor. And the cases that I have done where we have a stipulation . . . all the

Court does is check that for the jury . . . ." After defense counsel agreed that "[t]hat would be fine," the circuit court said, "I would answer the question yes then on behalf of the jury." The prosecutor assented to this plan, and, insofar as the record reflects, defense counsel was silent.

¶ 16. The circuit court proposed that the jury be given a verdict form "that allows the . . . jury to find the Defendant guilty or not guilty of the one charge. And then the question that I will answer for them regarding the weight." The attorneys agreed that this was the appropriate procedure to follow.

¶ 17. During final jury instructions, the circuit court stated that "[t]he District Attorney and the Attorney for Mr. Smith and Mr. Smith himself stipulated or agreed to the existence of certain facts. And those were the facts about the crime lab report. And that evidence, you must accept these facts as conclusively proved."

¶ 18. The circuit court concluded final jury instructions with the following comments:

> [T]he following two forms of verdicts will be submitted to you for your consideration concerning the charges against Mr. Smith. One reading, we, the jury, find the Defendant, Roshawn Smith, not guilty of party to a crime of possession with intent to deliver THC as charged in the Information. The other reading, we, the jury, find the Defendant, Roshawn Smith, guilty of party to the crime of possession with intent to deliver THC as charged in the Information. If you find the Defendant guilty, I have answered the following question based on the stipulation of the parties. Was the amount of THC including the weight of any substance or material mixed or combined with it more than 10,000 grams? That is the question that you would normally have to answer if you found the Defendant guilty. But because of the stipulation of the parties, I have answered it yes for you. So, you don't need to

724

answer that question. You just need to decide guilty or not guilty and have your foreperson sign one of the two verdicts.

¶ 19. Consistent with the circuit court's comments, the verdict form presented to the jury contained two pages: one for the foreperson to sign if the jury found Smith not guilty and one for the foreperson to sign if the jury found him guilty. The foreperson signed the latter. That form read, in its entirety, as follows:

We, the jury, find the defendant, Roshawn Smith, guilty of party to the Crime of Possession with Intent to Deliver THC, as charged in the Information.

If you find the defendant, guilty, the court has answered the following question based on the [s]tipulation of the parties:

Was the amount of THC including the weight of any other substance of material mixed or combined with it, more than 10,000 grams?

Under that question, the circuit court typed an "X" next to "Yes."

¶ 20. After his conviction, Smith was sentenced by the circuit court to a period of incarceration of eleven years, consisting of six years initial confinement followed by five years of extended supervision.

¶ 21. Smith filed a motion for post-conviction relief, seeking vacatur of his conviction and a directed judgment of acquittal or, in the alternative, a new trial. In that motion, he argued through counsel that the evidence was insufficient to support his conviction and that he was denied the right to a jury determination of the drug quantity. The circuit court denied the motion, finding the evidence sufficient and concluding that "the colloquy, combined with the written [s]tipulation, was

725

sufficient to allow [it] to conclude that the defendant knowingly, intelligently and voluntarily waived his right to have the jury determine the weight of the controlled substance in each package."

¶ 22. Smith appealed. In an unpublished opinion, the court of appeals held that the evidence was sufficient to support the conviction. *State v. Smith*, No. 2010AP1192–CR, unpublished slip op., ¶ 1 (Wis. Ct. App. May 26, 2011). However, the court also held that Smith did not waive his right to a jury determination of the drug quantity. Because the parties had not fully briefed the issue of the appropriate remedy, the court of appeals remanded the cause to the circuit court for a determination of the proper remedy in light of the error. *Id.*

¶ 23. Both parties petitioned our court for review. We granted those petitions.

## II. STANDARD OF REVIEW

■■■

¶ 24. The question of whether the evidence was sufficient to sustain a verdict of guilt in a criminal prosecution is a question of law, subject to our de novo review. *State v. Booker*, 2006 WI 79, ¶ 12, 292 Wis. 2d 43, 717 N.W.2d 676. When conducting such a review, we consider the evidence in the light most favorable to the State and reverse the conviction only where the evidence "is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) (citation omitted). Therefore, this court will uphold the conviction if there is any reasonable hypothesis that supports it. *State v. Blair*, 164 Wis. 2d 64, 68 n.1, 473 N.W.2d 566 (Ct. App. 1991). Because there is significant dispute between the parties

regarding the proper standard of review on the sufficiency of the evidence question, we will further clarify the standard in the analysis to follow.

¶ 25. The question of whether Smith waived his right to a jury trial poses a constitutional issue as well as an issue of statutory interpretation. Both are reviewed de novo, though we benefit from the analyses of the court of appeals and the circuit court. *State v. Lamar*, 2011 WI 50, ¶ 24, 334 Wis. 2d 536, 799 N.W.2d 758 (reiterating that constitutional issues of law are reviewed de novo); *State v. Dowdy*, 2012 WI 12, ¶ 25, 338 Wis. 2d 565, 808 N.W.2d 691 (reiterating that questions of statutory construction are reviewed de novo).

## III. DISCUSSION

¶ 26. We first consider whether the evidence was sufficient to sustain Smith's conviction and hold that it was. We next take up the question of whether Smith waived his right to a jury determination on the drug quantity and answer that he did not but that the error was harmless.

### A. The Evidence Was Sufficient to Support Smith's Conviction

¶ 27. The court of appeals decided that the evidence was sufficient to support Smith's conviction. We agree with that decision.

### 1. Clarifying the Standard of Review

¶ 28. Because the question of the proper standard of review has given rise to significant disagreement between the parties, we pause to clarify that question.

### a. Appellate Courts Must Defer to Reasonable Inferences Drawn by the Jury from the Evidence

¶ 29. We understand Smith's central argument regarding the standard of review on the evidentiary question to be summed up in the proposition that a jury verdict of guilt[9] must be reversed on appeal if "[t]he inferences that may be drawn from the circumstantial evidence are as consistent with innocence as with guilt." *State v. Hall*, 271 Wis. 450, 452, 73 N.W.2d 585 (1955). That was the law once, but it no longer is.

■

¶ 30. In *State v. Poellinger* we clarified the appropriate appellate framework for the review of evidentiary sufficiency after a jury hands down a guilty verdict. In that case, we stated both unanimously and unequivocally that when "viewing evidence which could support contrary inferences, the trier of fact is free to choose among conflicting inferences of the evidence and may, within the bounds of reason, *reject that inference which is consistent with the innocence of the accused.*" *Poellinger*, 153 Wis. 2d at 506 (emphasis altered).

¶ 31. In *Poellinger* we observed that the court's jurisprudence prior to that case "often failed to maintain the appropriate distinction between the" jury's inquiry at trial and our own on appeal. *Id.* at 504. In particular, we noted that we had "mistakenly stated that a conviction based on circumstantial evidence may

---

[9] In defense of his proposed standard of review, Smith includes three full pages of citations to civil cases, encompassing fourteen decisions. There are sufficient criminal law cases that clarify our standard of review on the evidentiary question that we need not draw from civil law jurisprudence. Indeed, we believe such a comparison would be more distracting and confusing than helpful. Accordingly, we decline to address the standard of review that applies in civil matters.

be sustained on appeal or review if the evidence is sufficiently strong to exclude every reasonable theory of innocence" and similarly "mistakenly stated that when a conviction is based on circumstantial evidence, an appellate court must uphold the conviction if a reasonable trier of fact could be convinced that the evidence is strong enough to exclude to a moral certainty every reasonable hypothesis of innocence." *Id.* at 504–05. *Poellinger* corrected those errors and resolved that confusion, holding, we repeat, that for purposes of appellate review "the trier of fact is free to choose among conflicting inferences of the evidence and may, within the bounds of reason, reject that inference which is consistent with the innocence of the accused." *Id.* at 506 (emphasis removed).

¶ 32. Although *Poellinger* did not explicitly mention *Hall* as one of the sources of confusion in its prior case law, it did not purport to present an exhaustive list of such sources. *See id.* at 757 n.5 ("*See, e.g.,* . . ."). Moreover, it is apparent from the holding and reasoning of *Poellinger* that *Hall* did not survive the opinion. For *Hall* required Wisconsin appellate courts to reverse jury verdicts of guilt if "[t]he inferences that may be drawn from the circumstantial evidence are as consistent with innocence as with guilt." *Hall*, 271 Wis. at 452. There is simply no way to reconcile that proposition with the principle enunciated in *Poellinger*, that "an appellate court must accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." *Poellinger*, 153 Wis. 2d at 506–07. Put simply, *Hall* permitted an appellate court to unsettle a jury verdict of guilt where a reasonable inference of guilt could have been rationally drawn by the jurors from the evidence when *Poellinger* forbids it. In other words, the two cases state manifestly

incompatible rules of law and Poellinger corrected the jurisprudence of which *Hall* was a part. Therefore, *Hall* was overruled by *Poellinger*, it is no longer good law, and Smith may not rely upon it.[10]

■

¶ 33. We also use this opportunity to reaffirm the soundness of the reasoning of *Poellinger*. The rule articulated in *Poellinger* was based on the principle that it is inappropriate for an appellate court to "replace[] the trier of fact's overall evaluation of the evidence with its own." *Poellinger*, 153 Wis. 2d at 506. That is a venerable principle, in this jurisdiction, *see, e.g.*, *Nudd v. Wells*, 11 Wis. 426, *434 (1860), and every other. *See generally* Shaun P. Martin, *Rationalizing the Irrational: The Treatment of Untenable Federal Civil Jury Verdicts*, 28 Creighton L. Rev. 683 (1995) (reviewing the relationship between appellate courts and juries). The position staked out in *Hall* that a jury verdict of guilt can be reversed on appeal if "[t]he inferences that may be drawn from the circumstantial evidence are as consistent with innocence as with guilt," *Hall*, 271 Wis. at 452, contradicts this deeply rooted tradition of judicial deference for jury verdicts. Indeed, there are few legal principles more indisputable than the idea that a jury is in a far better position to evaluate the evidence than is

___

[10] That *Hall* did not survive *Poellinger* is further evidenced by the fact that *Hall* has not been cited favorably by a single decision from any court in any jurisdiction subsequent to *Poellinger*'s publication. *Poellinger,* by contrast, has been cited favorably by appellate courts well over a thousand times, including hundreds of citations by the Wisconsin Court of Appeals, both published and unpublished, and several approving citations by our own court, including one earlier this term. *See State v. Hanson,* 2012 WI 4, ¶ 15, 338 Wis. 2d 243, 808 N.W.2d 390; *State v. Watkins,* 2002 WI 101, ¶¶ 67–68, 255 Wis. 2d 265, 647 N.W.2d 244.

a reviewing court. *See, e.g., In re Dejmal's Estate,* 95 Wis. 2d 141, 151, 289 N.W.2d 813 (1980) ("As this court has frequently stated, it is not our function to review questions as to weight of testimony and credibility of witnesses. These are matters to be determined by the trier of fact . . . . "). *Hall* and the other decisions overruled by *Poellinger* gave insufficient respect to the crucial role of the jury in our criminal justice system. For they allowed an appellate court to disturb a jury verdict even where it was based on a reasonable inference drawn from the evidence, simply because the appellate court preferred *another* reasonable inference. *Poellinger* was right to correct our case law when it strayed from these important principles, and we reaffirm its correction.

### b. Viewing the Evidence Collectively

¶ 34. Smith confuses the appropriate standard of review in another important respect. Specifically, he criticizes the court of appeals for refusing to "consider pieces of evidence individually" and instead "view[ing] the evidence as a whole in order to determine whether a jury could have found guilt beyond a reasonable doubt." In Smith's view, the court of appeals' determination that it is more appropriate to view the evidence as a whole constitutes a "novel proposition."

¶ 35. Far from novel, the court of appeals' approach was in line with our well-settled practice. As we explained in *Hussong v. State,* an appellate court reviews the evidence submitted at a criminal trial "as a whole, each piece of the puzzle being properly in place." 62 Wis. 2d 577, 587, 215 N.W.2d 390 (1974), *overruled in part on other grounds by Poellinger,* 153 Wis. 2d at 504 n.5. It would hardly make sense to view the evidence any other way.

¶ 36. No individual, applying his or her logic, would base the ultimate vote of guilt or innocence on a review that ignores every piece of evidence but one. We do not, and should not, ask jurors to leave their common sense behind at the courthouse door. *See State v. Alexander*, 214 Wis. 2d 628, 648, 571 N.W.2d 662 (1997) ("A strength of our jury system is that jurors . . . bring their experiences, philosophies, and common sense to bear in their deliberations.") (internal quotation marks and citation omitted). Indeed, the jurors here were specifically instructed to employ their common sense.[11] The rational juror would take into account the entire picture presented by the evidence in ascertaining guilt or innocence. Such a juror would not find any single piece of evidence determinative, but would rather consider the evidence in the aggregate. The aggregate is, of course, composed of the individual pieces of evidence; nevertheless, that does not mean, as Smith suggests, that the juror must ignore the larger picture so as to focus on each piece in a vacuum and ask whether that piece standing alone supports a finding of guilt. That is not how people seek to determine the truth, whether in a jury room or anywhere else, and that is not how they can most reasonably make the grave determination as to a defendant's guilt.[12] Accordingly, we reaffirm that an

[11] Quoting the pattern jury instructions, the circuit court told the jury, "There is no magic way for you to evaluate testimony. Use your common sense and experience." WIS JI-CRIMINAL 50.

[12] Smith contends that a judicial examination of the totality of the evidence "is fundamentally at odds" with the due process requirement that courts "assess the historic facts" when inquiring into the validity of a conviction. *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). It is a tautology that a sufficiency of the evidence challenge entails a review of the facts: the facts for

appellate court must consider the totality of the evidence when conducting a sufficiency of the evidence inquiry.

## 2. Application of the Sufficiency of the Evidence Test

¶ 37. Applying the principles set forth above, there is no question that the evidence was sufficient to support Smith's conviction.

¶ 38. To establish that Smith was culpable as a party to the crime, under the conspiracy prong of the statute relied upon by the State, the prosecution was required to prove beyond a reasonable doubt that: 1) there was an agreement among two or more persons to direct their conduct toward the realization of a criminal objective; and 2) each member of the conspiracy individually and consciously intended the realization of the particular criminal objective.[13] *State v. Hecht*, 116 Wis. 2d 605, 624–25, 342 N.W.2d 721 (1984) (setting

purposes of judicial review of a trial come in no other form than the evidence; to determine whether the evidence was sufficient therefore obviously requires a consideration of the facts. But *Jackson* says nothing about *how* that assessment should take place, i.e., whether it should focus on each piece of evidence separately or on the entirety of the evidence. Indeed, the United States Supreme Court has recently applied *Jackson* in an opinion that considers the facts collectively, without weighing each piece individually. *See Coleman v. Johnson*, 566 U.S. __, 132 S. Ct. 2060 (2012) (per curiam) (finding the evidence sufficient to support conspiracy guilt under the *Jackson* standard).

[13] It is important to remember that we discuss conspiracy in this opinion only as a subset of party to the crime culpability. For that reason, we will henceforth refer to the culpability as PTC conspiracy. We do not analyze conspiracy as a freestanding offense.

forth the elements of party to the crime ("PTC") conspiracy).

¶ 39. Testimony at trial established (in relevant part) the following narrative. Smith introduced Kortbein to Thomas. Thomas then called Kortbein and asked her if she would be willing to receive packages at her home in return for $500 per delivery. She agreed, and over the next few weeks received three shipments similar to packages that were later seized by law enforcement and found to contain drugs. After each shipment arrived, Thomas retrieved it from Kortbein within a few days and Smith gave her $400 within a few more days. During the periods when the packages were being delivered, Thomas, Kortbein, and Smith were communicating by phone in a manner that the jury heard from Sergeant Poteat was consistent with the "courier relationship." Around the same time, Smith asked Mehlhorn to receive packages on his behalf, and several arrived from California and were picked up by Smith and Thomas.

¶ 40. Smith does not argue, nor do we find a basis to conclude, that this testimony was "incredible as a matter of law." *Poellinger*, 153 Wis. 2d at 506–07. Therefore, deferring to the jury's decision to credit this testimony, as we must, *id.* at 504, the narrative established by the State's witnesses provided a solid foundation from which the jury could have drawn an inference that Smith shared PTC conspiracy culpability for the drug offense. For that narrative strongly suggested that Smith brought two other participants in a drug scheme together (Thomas and Kortbein), helped facilitate the transportation and receipt of the drugs by relaying payments while seeking to insulate himself as much as possible from potential liability, and arranged a similar scheme with another individual (Mehlhorn).

¶ 41. From this evidence, the jury could reasonably have inferred that Smith was guilty as a party to the crime of possession with intent to deliver. For the evidence suggested that Smith introduced Thomas and Kortbein and then facilitated the transfer of money from one to the other after Kortbein received the drugs and conveyed them to Thomas. Thus, the jury could reasonably have concluded that there was "[a]n agreement among two or more persons to direct their conduct toward the realization of a criminal objective," namely the delivery of marijuana. *Hecht*, 116 Wis. 2d at 625. Furthermore, Smith's personal involvement in the acts described above—i.e., the introduction of Thomas to Kortbein and the delivery of the money—supports a rational inference that he "individually [and] consciously intend[ed] the realization of the particular criminal objective." *Id.* He thus had "an individual stake in the venture," *id.*, and the second element of PTC conspiracy was satisfied. Therefore, there was sufficient evidence for the jury to find Smith guilty of being a party to the crime of possession with intent to deliver more than 10,000 grams of THC.[14]

¶ 42. To attack the conclusion that the evidence was sufficient to support the jury verdict, Smith presents a series of hypotheticals:

> It is possible that Thomas already had a criminal scheme in mind when Smith introduced him to

---

[14] We also agree with the court of appeals that the same evidence that substantiated Smith's PTC conspiracy guilt could support a reasonable determination by the jury that he was guilty of aiding and abetting as a party to the crime. *See State v. Rundle*, 176 Wis. 2d 985, 990, 500 N.W.2d 916 (1993) (setting forth the requirements for proving aiding and abetting as a party to the crime).

Kortbein, and it is also possible that he didn't .... If Thomas already had a criminal scheme in mind then it is possible that he told Smith about it, and it is also possible that he didn't .... It is possible that Smith was present with Thomas when Thomas called Kortbein to make his offer to her, and it is also possible that Smith wasn't present .... If Smith was present when Thomas called Kortbein then it is possible that Smith had agreed to assist the scheme, and it is also possible that he was just an ambivalent bystander to a telephone conversation .... It is possible that Smith had agreed to assist Thomas's criminal scheme, and it is also possible that Smith simply acquiesced in a general request by Thomas to deliver money to Kortbein .... It is possible that the packages that had been delivered prior to September 20, 2006, contained marijuana or other unlawful contraband, and it is also possible that they were just "test" deliveries to ascertain Kortbein's trustworthiness.

¶ 43. As an initial matter, not all of these hypotheticals are relevant to Smith's guilt or innocence. For instance, it is of no significance whether Smith "was present with Thomas when Thomas called Kortbein to make his offer to her." He could just as easily have agreed to the scheme and *not* been present. *Cf. United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) ("It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence.").

¶ 44. Smith's reasoning suffers from two more serious flaws. First, our duty when reviewing the sufficiency of evidence supporting a jury verdict of guilt is not to ask what is "possible." Anything, after all, is possible. *See, e.g., United States v. Ytem*, 255 F.3d 394, 397 (7th Cir. 2001) (Posner, J.) ("*Anything* is possible; there are no metaphysical certainties accessible to

human reason; but a merely metaphysical doubt (for example, doubt whether the external world is real, rather than being merely a dream) is not a reasonable doubt for purposes of the criminal law.") (emphasis in original) (citing, inter alia, *Victor v. Nebraska*, 511 U.S. 1, 13 (1994) ("[A]bsolute certainty is unattainable in matters relating to human affairs.")). Rather, our duty, consistent with the limitations of human knowledge and with the deference we owe the jury, is to decide whether "any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial." *Poellinger*, 153 Wis. 2d at 506. For the reasons already stated, it is plain that such a possibility exists in this case.

¶ 45. Relatedly, Smith's treatment of each piece of evidence in isolation is an apt demonstration of why appellate courts must reject that method. It makes little sense to consider the various "possibilities" posed by Smith without taking into account the overall picture drawn by the witnesses. The likelihood that an inference of innocence was the correct one on each individual piece of evidence recedes dramatically when those pieces are considered in juxtaposition. That is, if the jury was told that Smith introduced Thomas and Kortbein, that Kortbein then received a shipment of drugs, and that Thomas retrieved them, but *not* told that Smith paid Kortbein $400 shortly thereafter, it would be more plausible that Smith had no knowledge of the drug scheme. But they *were* told about the payments.[15] Likewise, if the jury had not heard testimony that Smith established a similar arrangement with Thomas and Mehlhorn, it would have been more plausible that he was unwittingly brought into the

---

[15] Of the money that Smith gave to Kortbein, the prosecutor asked rhetorically during her closing argument, "Why else

delivery involving Kortbein. But they *were* told about the other arrangement. Each piece of evidence gave the other pieces more context, and allowed the jury to more thoroughly and more accurately evaluate Smith's likely guilt or innocence. That is why juries (and reviewing courts) consider the evidence in its totality, and that is why the evidence was sufficient to support Smith's conviction.[16]

B. Smith Did Not Waive his Right to a Jury Determination of the Drug Quantity but the Error Was Harmless

¶ 46. Turning to the next issue, we first consider whether Smith had a right to a jury determination of the quantity of drugs involved and conclude that he did. We then consider whether he waived that right and conclude that he did not, but further conclude that the error was harmless.

1. Smith Had a Constitutional Right to a Jury Determination of the Drug Quantity Involved in His Offense

¶ 47. Both parties agree that Smith had a right to a jury determination of the drug quantity involved in his offense and the court of appeals so held. We agree as well.

––––––––––––––––––––

would he pay her" if not in compensation for receiving the drugs. The defense never offered to the jury an alternative reason.

[16] Smith makes much of the purported ambiguities in Mehlhorn's statement at trial that Smith acknowledged to him that he had been involved in "a marijuana thing with a girl" but was not worried about it "[b]ecause it was his word against hers." As our discussion above indicates, we believe there was ample evidence to sustain Smith's conviction without that testimony. Nevertheless, we note that while "it was possible"

¶ 48. The federal and state constitutions both protect a criminal defendant's right to a jury trial. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."); Wis. Const. art. I, § 7 ("In all criminal prosecutions the accused shall enjoy the right . . . to a speedy public trial by an impartial jury . . . .").

¶ 49. In *Apprendi v. New Jersey*, the United States Supreme Court set forth the seminal holding that the right to a criminal jury trial enshrined in the Sixth Amendment of the U.S. Constitution requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). The *Apprendi* court also explained that such an analysis is properly focused not on the sentence that is actually handed down, but on the punishment that becomes *available* as a result of the fact in question. *See id.* ("It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant *is exposed*.") (emphasis added) (internal quotation marks, brackets, and citation omitted); *see also United States v. O'Brien*, 560 U.S. __, 130 S. Ct. 2169, 2174 (2010) (quoting cited language from *Apprendi* with approval).

---

that Smith's alleged statements did not represent an admission of complicity in the criminal enterprise (but rather, as Smith essentially contends, a reference to the prosecution itself), the jury was entitled to draw a reasonable inference to the contrary, especially given the numerous other pieces of evidence that weighed far more strongly toward a finding of guilt.

¶ 50. Applying *Apprendi* to the instant case, it is plain that Smith had a constitutional right to a jury determination of the drug quantity involved in his offense. For if Smith were found guilty of possession of marijuana with intent to deliver, but there was no evidence as to amount, the highest sentence he could have received would have been three and a half years. Wis. Stat. § 961.41(1m)(h)1. (stating that possession of two hundred grams or less of THC (the lowest amount mentioned in the statute) with intent to deliver is a Class I felony); § 939.50(3)(i) (stating that the commission of a Class I felony is punishably by "imprisonment not to exceed 3 years and 6 months"). Because he was found guilty of possession of more than 10,000 grams of THC with intent to deliver, however, Smith was subject to incarceration for up to 15 years. § 961.41(1m)(h)5. (stating that possession of more than 10,000 grams of THC with intent to deliver is a Class E felony); § 939.50(3)(e) (stating that the commission of a Class E felony is punishable by "imprisonment not to exceed 15 years.").

¶ 51. Therefore, the fact in question (whether more than 10,000 grams of THC was involved in the offense) exposed Smith to a higher penalty. Consequently, he had a constitutional right to a jury determination of the amount.

2. Smith Did Not Waive his Right to a
Jury Determination of the Drug Quantity

¶ 52. The parties and the court of appeals also agree that Smith did not waive his right to a jury determination of the drug quantity. We concur.

¶ 53. As we have noted, Smith's right to a jury determination of the drug quantity involved in his

offense was protected by the constitutional provisions guaranteeing a criminal defendant's right to a jury trial. The right to a criminal jury trial is in that class of rights considered "so fundamental that they are deemed to be personal rights which must be waived personally by the defendant." *State v. Gordon*, 2003 WI 69, ¶ 49, 262 Wis. 2d 380, 663 N.W.2d 765; *State v. Livingston*, 159 Wis. 2d 561, 569, 464 N.W.2d 839 (1991) ("[A]ny waiver of the defendant's right to trial by jury must be made by an affirmative act *of the defendant himself.* The defendant must act personally; he and only he has the power and authority to waive his right to a jury trial . . . .") (emphasis added). As such, it would be error for the circuit court to have answered the question of drug quantity unless Smith waived his right to a jury determination of that question. *Livingston*, 159 Wis. 2d at 569.

¶ 54. For a defendant's action to qualify as a valid waiver of a constitutional right, he must waive the right knowingly, intelligently, and voluntarily, with "sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). A judicial inquiry into whether a valid waiver occurred "must depend upon the unique circumstances of each case." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1942). Nevertheless, the valid waiver of a constitutional right can never occur where the defendant is unaware of the right at issue. *See, e.g., State v. Brown*, 2006 WI 100, ¶ 29, 293 Wis. 2d 594, 716 N.W.2d 906 ("[F]or a plea to function as a valid waiver of constitutional rights, the plea must be an intentional relinquishment of *known* rights.") (citation omitted) (emphasis added). As a result, for the State to prove that the valid waiver of a constitutional right occurred it would have to demonstrate that Smith knew of his constitutional right to a jury determination of the drug quantity. *See id.*

¶ 55. The State does not purport to make such a showing. It declines to do so for good reason. Of the three exchanges that took place between the circuit court and Smith regarding his stipulation to the drug quantity, none suggest that he was informed that he had a constitutional right to a jury determination of the drug quantity, let alone that he was waiving such a right. Indeed, none of the exchanges even *mention* the jury. Rather, to the extent that the stipulation and its consequences were explained to Smith at all, they were explained only with reference to the fact that the crime lab technician who measured the quantity of THC would not be testifying. Nothing was said about a right to have the jury determine the drug quantity. Even the prosecutor stated that she "had originally requested that that stipulation be read to the jury," not that the circuit court answer the quantity question itself.

¶ 56. Because the circuit court failed to inform Smith that he had a right to a jury determination of the drug quantity, and failed to ask him if he intended to waive that right, the only reason for us to conclude that he nevertheless waived it would be if his stipulation were somehow equivalent to a waiver. However, such a conclusion would ignore an important distinction. The right to a criminal jury trial is a crucial constitutional right with deep roots in our history and our legal philosophy as a society. *See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) ("[T]rial by jury in criminal cases is fundamental to the American scheme of justice . . . ."); Albert W. Alschuler & Andrew G. Deiss, *A Brief History of the Criminal Jury in the United States*, 61 U. Chi. L. Rev. 867, 871 (1994) ("The framers' enthusiastic support for the jury stemmed in large measure from the role that juries had played in resisting English authority before the Revolution."). By contrast, a stipulation is simply a matter of convenience

and litigation strategy, entered into to avoid the time, expense, and potential prejudice of introducing unnecessary and possibly prejudicial evidence.[17] *Compare United States v. Teague*, 953 F.2d 1525, 1531 (11th Cir. 1992) (en banc) (holding that defense counsel is ordinarily permitted to make decisions regarding trial strategy, including "what stipulations should be made") *with Livingston*, 159 Wis. 2d at 569 ("[A]ny waiver of the defendant's right to trial by jury must be made by an affirmative act *of the defendant himself.* The defendant must act personally; he and only he has the power and authority to waive his right to a jury trial . . . .") (emphasis added).

¶ 57. It is therefore a far different thing for a defendant to stipulate to a fact than it is for him to waive his constitutional right to a jury determination of that fact. Smith did the former but not the latter. He was never informed that he had a constitutional right to a jury determination of the drug quantity, nor was he ever given the opportunity to waive or invoke that right. Accordingly, we hold that Smith did not waive his constitutional right to a jury determination of the drug quantity. As a result, it was error for the circuit court to answer the question of quantity for the jury.

### 3. The Error Was Harmless

¶ 58. Unlike the preceding two questions, the parties diverge on the issue of the appropriate remedy to correct the error they agree occurred at the circuit court. Smith contends that he is entitled to a new trial,

---

[17] The decision to stipulate in Smith's case was clearly made to avoid potential prejudice. As defense counsel remarked to the circuit court, there was a concern that the sight of such a large quantity of drugs would "arouse the jury's sense of . . . horror or . . . provoke its . . . instinct to punish."

arguing that "[i]n the absence of a valid waiver, the remedy of a new trial is applicable no matter how overwhelming the evidence . . . because the wrong fact-finding entity has adjudicated the defendant's guilt." The State responds that we should apply a harmless error test, and that under such a test the conviction should be reinstated because "[t]he weight element was uncontroverted and by virtue of the stipulation, it was supported by overwhelming evidence." We agree with the State that a harmless error analysis is required by our well-reasoned case law and that of the United States Supreme Court, and we agree that the error here was harmless.

### a. Constitutional Analysis

¶ 59. To refute the appropriateness of a harmless error analysis, Smith relies heavily upon *State v. Villarreal*, 153 Wis. 2d 323, 450 N.W.2d 519 (Ct. App. 1989). It is true that *Villarreal* held that a harmless error analysis is inappropriate when a court erroneously decides a fact that should have been submitted to the jury. But that proposition has been renounced by subsequent decisions of the United States and Wisconsin Supreme Courts.

¶ 60. The legal landscape concerning this issue is now shaped by *Neder v. United States*, 527 U.S. 1 (1999). In that case, a federal district court erroneously told a jury that to convict Neder of various fraud offenses it was not required to consider the materiality of any allegedly false statements, because materiality was "not a question for the jury to decide." *Neder*, 527 U.S. at 6. The Supreme Court upheld the conviction, concluding that the error was harmless. *Id.* at 25. Relying on the proposition that where a defendant "was tried by an impartial adjudicator, there is a strong

744

presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis," the *Neder* court held that an element erroneously omitted from the jury instructions does not "affect[] the framework within which the trial proceeds" or "render a trial fundamentally unfair." *Id.* at 8 (citations, internal quotation marks, and brackets removed).

¶ 61. We adopted *Neder*'s approach in *State v. Harvey*, 2002 WI 93, 254 Wis. 2d 442, 647 N.W.2d 189. Noting that Wisconsin's "statutory harmless error rule[18] . . . is almost identical to the federal rule," we held in *Harvey* that harmless error analysis applies where a court erroneously takes judicial notice of a fact that should have been submitted to the jury. *Id.*, ¶ 39.

¶ 62. While neither *Neder* nor *Harvey* is on all-fours with the instant case, insofar as neither involved stipulations, their rationales nevertheless control the outcome here. For both involved a judicial determination of a fact that the jury was constitutionally required to find. And both held that an appellate court reviews such cases for harmless error. Here too a court an-

---

[18] In Wisconsin, the harmless error rule is codified in Wis. Stat. § 805.18, which provides:

(1) The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party.

(2) No judgment shall be reversed or set aside or new trial granted in any trial or proceeding on the ground of selection or misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial.

swered a question that, under the Sixth Amendment, should have gone to the jury. Accordingly, we are bound by the precedent of our own prior decisions and those of the United States Supreme Court to apply a harmless error analysis.[19]

¶ 63. As with the previous question regarding whether an error occurred, it is useful to reiterate the persuasive reasoning underlying the case law that we are duty-bound to apply. That reasoning is, simply put, that an error does not "affect the framework within which the trial proceeds" or "render a trial fundamen-

---

[19] Our conclusion that *Neder* and *Harvey* effectively overruled *Villarreal* is bolstered by the fact that *Harvey* explicitly overruled *State v. Leist,* 141 Wis. 2d 34, 414 N.W.2d 45 (Ct. App. 1987), a case relied upon by *Villarreal* for the very issue under consideration. *State v. Harvey,* 2002 WI 93, ¶ 35 n.10, 254 Wis. 2d 442, 647 N.W.2d 189 (overruling *Leist* in part); *State v. Villarreal,* 153 Wis. 2d 323, 331, 450 N.W.2d 519 (relying on *Leist*). We note that *Villarreal* is overruled only with respect to its holding that a harmless error analysis is inappropriate when a court erroneously finds a fact that should have been found by the jury. It remains good law with respect to its unrelated holdings. *See Blum v. 1st Auto & Cas. Ins. Co.,* 2010 WI 78, ¶ 42, 326 Wis. 2d 729, 786 N.W.2d 78 ("hold[ing] that when the supreme court overrules a court of appeals decision, the court of appeals decision no longer possesses any precedential value, unless this court expressly states otherwise"). The State argues that *State v. Livingston,* 159 Wis. 2d 561, 573, 464 N.W.2d 839 (1991) and *State v. Hauk,* 2002 WI App 226, ¶ 32, 257 Wis. 2d 579, 652 N.W.2d 393 must be overruled. However, those cases involved different factual circumstances than those at issue here. We therefore decline to address them. *See Miller Brands-Milwaukee, Inc. v. Case,* 162 Wis. 2d 684, 696, 470 N.W.2d 290 (1991) (reiterating that the court resolves the facts before it, and does not issue advisory opinions or address hypothetical facts).

tally unfair" where "an impartial adjudicator," i.e., a judge, finds a fact rather than an alternative impartial adjudicator, i.e., a jury. *Neder*, 527 U.S. at 8 (citations, internal quotation marks, and brackets removed). Indeed, that reasoning is even more powerful where, as here, the defendant actually stipulates to the fact in question. For in such a case, as we shall see below when we apply the harmless error analysis, it can be said with even more assurance that the defendant, who agrees to the very fact at issue, received a fundamentally fair trial and that the outcome would have been the same absent the error. Simply put, a defendant who agrees to a fact cannot be heard to later complain that his trial was rendered fundamentally unfair when that fact was found, merely because the wrong neutral adjudicator found it.[20]

## b. Statutory Analysis

¶ 64. Perhaps in recognition of the force and clarity of *Neder* and *Harvey*'s constitutional jurisprudence, Smith devotes considerable energy to an additional or alternative statutory argument. He contends that the legislature's codification of a jury trial waiver procedure compels us to grant him a new trial, even if the United States and Wisconsin constitutions do not. We see no such mandate in the statute, and think it

---

[20] The dissent suggests that it is inconsistent of us to conclude both that Smith had a constitutional right to a jury determination of the drug quantity, and that the jury's failure to find that quantity was harmless error. Dissent, ¶ 77 ("[A]fter setting forth its soaring language [affirming Smith's constitutional right], the majority does an about face" in finding the error harmless). If it were inconsistent to affirm a constitutional right and then find a failure to observe it harmless, however, the harmless error test would be meaningless.

unwise to sever our state's criminal procedure from well-reasoned constitutional jurisprudence on the basis of legislation that does not require us to do so.

¶ 65. Smith's statutory argument revolves around Wis. Stat. § 972.02(1), which provides that "criminal cases shall be tried by a jury . . . unless the defendant waives a jury in writing or by statement in open court . . . on the record, with the approval of the court and the consent of the state." As Smith reads it, this provision represents a legislative decision to extend greater protections to Wisconsin citizens than those afforded by the state and federal constitutions. To his mind, § 972.02(1) means that there is no remedy short of retrial for an error such as the one that occurred here. We disagree.

¶ 66. Beginning with the plain language of the statute, as we must, *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110, we see nothing in Wis. Stat. § 972.02(1) that speaks to remedy at all. Smith emphasizes the "shall" in the statute, but that term provides no guidance on how a court should proceed if the statutory requirement is not satisfied. Indeed, the constitutional protections of criminal jury rights include the same word. U.S. Const. amend. VI ("In all criminal prosecutions, the accused *shall* enjoy the right to a speedy and public trial, by an impartial jury . . . .") (emphasis added); Wis. Const. art. I, § 7 ("In all criminal prosecutions the accused *shall* enjoy the right . . . to a speedy public trial by an impartial jury . . . .") (emphasis added). Given that these constitutional provisions contain highly similar language to § 972.02(1), including the very word that supposedly requires retrial, it would be incongruous for us to ignore the binding and persuasive reasoning in *Neder* and *Harvey* simply because a

748

statute, rather than a constitutional provision, is at issue. Such a result would also create disruptive conflict and confusion in the criminal justice system whereby radically different remedies become available depending on whether a defendant relies upon a statutory or constitutional provision, despite the fact that they say nothing different with respect to remedy.

¶ 67. Lastly, the same factors that led us to conclude that harmless error analysis was appropriate in the constitutional context carry the same weight in the statutory context. Regardless of whether the Sixth Amendment or Wis. Stat. § 972.02(1) are at issue, the fact remains that it makes no sense to order a new trial or reduce a sentence when a defendant is convicted and sentenced by a neutral adjudicator in accordance with a fact he admits in open court, simply because the fact is formally "found" by the wrong neutral adjudicator.

¶ 68. Because we are bound by the sound and well-reasoned opinions of the United States Supreme Court in *Neder* and our own court in *Harvey*, and because we decline to sever our statutory protection for jury trials from the constitutional provisions upon which it is based, we conclude that the circuit court's determination of the drug quantity involved in Smith's offense, a fact which should have been submitted to the jury, is subject to harmless error review.[21]

---

[21] One alternative to finding harmless error discussed by the parties and the court of appeals is a remand with instructions to the circuit court that Smith's sentence be reduced to the lowest sentence permitted by the statute. *Villarreal* is the only published decision in Wisconsin that found such a remedy appropriate in circumstances similar to these. *Villarreal,* 153 Wis. 2d at 332. Its holding in that regard was premised on a refusal to apply harmless error analysis and is therefore inapplicable here, given that we are compelled by precedent to conduct a harmless error analysis.

### c. Application of the Harmless Error Test

¶ 69. With these principles in mind, there can be no doubt that the error in Smith's trial was harmless. The Constitution and Wis. Stat. § 805.18(2) require the same harmless error showing: that it be "clear beyond a reasonable doubt that a properly instructed, rational jury would have found the defendant guilty of the . . . [charged] offense." *Harvey*, 254 Wis. 2d 442, ¶ 48. The State easily satisfies that test here.

¶ 70. To this day, Smith has never disputed that more than 10,000 grams of THC were found in the packages seized from Kortbein. Quite to the contrary, he expressly admitted in the circuit court no fewer than four times that those packages contained THC in an amount greater than 10,000 grams, and the jury was informed of that admission. As a result, "it is clear beyond a reasonable doubt that a properly instructed, rational jury would have found [Smith] guilty of the . . . [charged] offense," "the error [therefore] cannot have contributed to the verdict," and it was consequently harmless. *Harvey*, 254 Wis. 2d 442, ¶ 48; *see also Neder*, 527 U.S. at 18 (holding that an error is harmless if it "did not contribute to the verdict," requiring a court to conclude "beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error").

¶ 71. The dissent draws an interesting distinction between facts that are "undisputed" and those that are "indisputable," reasoning that *Neder* and *Harvey* involved the latter and this case the former. Dissent, ¶¶ 91–95. Though we acknowledge the creativity of the distinction, we fail to see any authority to support its legal significance. Nor do we understand why the distinc-

tion should make a difference. Indeed, in making its case for the distinction, the dissent explicitly deemphasizes the facts of the case at bar. *Id.*, ¶ 95 ("Although Smith opted not to dispute this fact, his stipulation does not transform the nature of the fact from one that can be subject to reasonable dispute into one that is indisputable."). We wonder who exactly the dissent imagines disputing the weight of the drugs, given that Smith himself, both attorneys, the judge, and the chemist agreed on it, and that no one to this day has challenged it. The dissent appears to focus on the possibility that *other* defendants in *other* cases will dispute such facts. *Id.* ("[T]his elemental fact [of the drug quantity] is the type of fact that is *often disputed by defendants* and *could have been disputed* in this case by Smith.") (emphasis added). No doubt *other* defendants do often dispute such facts, and no doubt Smith *could have* done so. But we are not dealing here with other defendants, we are dealing with Smith, and he elected *not* to dispute the drug quantity. The dissent proves too much. The very fact that another defendant might dispute the weight of the drugs in a similar case is what distinguishes such a case from Smith's. Smith did not dispute the weight of the drugs; he stipulated to the weight and acknowledged it repeatedly in open court.

¶ 72. The theoretical and pragmatic unworkability of the dissent's analysis is aptly illustrated by the fact that even where a defendant enters into a knowing, intelligent, and voluntary waiver of his right to the jury's determination of a given fact, as the dissent insists was required here, the fact is still "disputable" in the same sense the dissent applies to the drug quantity here, i.e., someone *else*, in another case, might dispute a similar fact. Surely there is no error there, though the dissent's approach implies there is.

¶ 73. Finally, even accepting the unprecedented "undisputed/indisputable" distinction drawn by the dissent, we question whether it meaningfully separates *Neder* and *Harvey* from this case. With respect to *Neder* and *Harvey*, the dissent's belief that the facts at issue in those cases were "indisputable" centers on the specific facts of those cases: respectively, whether Penn Park was a city park and whether the failure to report $5 million in income was material to a charge of tax fraud. *Id.*, ¶¶ 92–94. With respect to the instant case, however, the dissent's analysis is focused on drug quantity in *other* cases. *Id.*, ¶ 95 (remarking that drug quantity "is the type of fact that is *often disputed by defendants* . . . .") (emphasis added). But if the question is whether the *specific* fact at issue in a case is "indisputable," e.g., Penn Park being a city park, then should not the question here be whether the *specific* fact of the drug quantity involved in *Smith's* case is "indisputable"? And, if that is the question, on what grounds would it not be so regarded, given that no one involved in the case has ever disputed it? Conversely, if the question is whether the *type* of fact at issue in a case is "indisputable," e.g., drug quantity in general, then should not the question in *Neder* and *Harvey* have been whether other defendants, in other cases, might challenge the status of a park or the materiality of a failure to report income to a charge of tax fraud? And, if that is the question, how can we assume that criminal defense attorneys and their clients, as thorough and creative as they often are, will not raise such challenges? We can think of no principled basis for the discrepancy in the dissent's application of its self-made test, other than that it supports one result here and another in *Neder* and *Harvey*.

¶ 74. In sum, we respectfully decline the dissent's invitation to base our holding on willful blindness to the

one fact—Smith's acknowledgment of the drug quantity —upon which the entire case turns.

¶ 75. Because the error was harmless, we reverse the court of appeals and reinstate Smith's guilty verdict and judgment of conviction.

## IV. CONCLUSION

¶ 76. Two issues are presented for our consideration: 1) whether the evidence was sufficient to support Smith's conviction; and 2) whether Smith waived his right to a jury determination on the quantity of the drugs. Because a reasonable inference of Smith's guilt could have been drawn by the jury from the evidence presented at trial, viewed in its entirety, we hold that the evidence was sufficient to sustain the conviction and agree with the court of appeals' decision in that regard. Second, while we determine that Smith had a constitutional right to a jury determination of the drug quantity, and although the circuit court determined that question without eliciting from Smith a proper waiver of that right, we conclude the error was harmless because it is clear beyond a reasonable doubt that a properly instructed, rational jury would have found Smith guilty of the charged offense absent the error. The court of appeals therefore erred in remanding the cause to the circuit court. Accordingly, we reverse the court of appeals and reinstate the guilty verdict and judgment of conviction.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 77. ANN WALSH BRADLEY, J. (*dissenting*). The majority opinion contains strong language heralding the constitutional right to a trial by jury. Yet, after

753

setting forth its soaring language, the majority does an about face.

¶ 78. It explains that it matters not whether Smith actually knew that he had a right to have a jury determine the fact of drug quantity. And, it matters not whether that fact was found by a judge or jury. According to the majority, it is no big deal because although the judge erred by violating Smith's constitutional right to a trial by jury, the error is harmless.

¶ 79. I disagree with the majority's application of the harmless error doctrine here because it extends that doctrine beyond the limited circumstances in the cases it cites and further erodes the vitality of the constitutional right to a trial by jury. Instead, I would remand to the circuit court for a determination of whether Smith knowingly, voluntarily, and intelligently waived his right to a jury determination of all elements of the crime. Accordingly, although I agree with the majority's determination regarding the sufficiency of the evidence, I respectfully dissent.

I

¶ 80. The majority recognizes that Smith had a right to a jury determination of each and every fact that increases the penalty for a crime beyond the statutory maximum. Majority op., ¶¶ 50–51. It agrees with the parties that the circuit court erred by directing an answer to the question of the weight of the marijuana without securing Smith's knowing, intelligent, and voluntary waiver of a jury determination of that fact. *Id.*, ¶¶ 53, 55. It acknowledges that it is "a far different thing for a defendant to stipulate to a fact than it is for him to waive his constitutional right to a jury determination of that fact." *Id.*, ¶ 57.

¶ 81. Nevertheless, relying on *State v. Harvey,* 2002 WI 93, 254 Wis. 2d 442, 647 N.W.2d 189, and *Neder v. United States,* 527 U.S. 1 (1999), the majority asserts that "a harmless error analysis is required by our well-reasoned case law and that of the United States Supreme Court." Majority op., ¶ 58. Although the majority acknowledges that neither *Harvey* nor *Neder* involved a stipulation, it concludes that "their rationales nevertheless control the outcome here." *Id.,* ¶ 62. It contends: "Simply put, a defendant who agrees to a fact cannot be heard to later complain that his trial was rendered fundamentally unfair when that fact was found, merely because the wrong neutral adjudicator found it." *Id.* ¶ 63.

¶ 82. The majority refrains from overruling *State v. Livingston,* 159 Wis. 2d 561, 464 N.W.2d 839 (1991), and *State v. Hauk,* 2002 WI App 226, 257 Wis. 2d 579, 652 N.W.2d 393, cases in which the court concluded that a harmless error analysis was inapplicable when the circuit court failed to secure the defendant's personal waiver of the right to a jury trial. Without further explanation, the majority concludes that "those cases involved different factual circumstances from those at issue here." Majority op., ¶ 62 n.19.

II

¶ 83. The right to a jury trial is enshrined in two places in the United States Constitution. U.S. Const. art. III, § 2 ("the Trial of all Crimes, except in Cases of Impeachment, shall be by Jury"); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury"). After the American Revolution, Alexander Hamilton wrote that "[t]he friends and adversaries of the plan of the [Constitutional] convention, if they

agree in nothing else, concur at least in the value they set upon the trial by jury[.]" The Federalist No. 83, p. 426 (M. Beloff ed. 1987).

¶ 84. The majority opinion contains strong language heralding the right to a jury trial. It asserts that the right to a criminal jury trial is "fundamental," and that it can be waived only if the defendant has "sufficient awareness of the relevant circumstances and likely consequences." *Id.,* ¶¶ 53–54. The majority proclaims that no valid waiver could occur if the defendant were unaware that he had a right to a jury determination of every elemental fact. *Id.,* ¶ 54.

¶ 85. After setting forth this soaring language, however, the majority does an about face. It explains that it matters not whether Smith actually knew that he had a right to a jury determination of drug quantity because "an error does not affect the framework within which the trial proceeds . . . where an impartial adjudicator, i.e., a judge, finds a fact rather than an alternative impartial adjudicator, i.e., a jury." *Id.,* ¶ 63. "Simply put," the majority asserts, "a defendant who agrees to a fact cannot be heard to later complain that his trial was rendered fundamentally unfair when that fact was found, *merely because the wrong neutral adjudicator found it.*" *Id.* (emphasis added).

¶ 86. This explanation evinces a lack of appreciation of the reason underlying the right to a trial of one's peers. The identity of the fact finder is no trifling matter.

¶ 87. The point of the right to a jury trial is that the identity of the "neutral adjudicator" is important. Our system gives the guilt determination to a jury because, "absent voluntary waiver of the jury right, the Constitution does not trust judges to make determinations of criminal guilt." *Neder,* 527 U.S. at 32 (Scalia, J.,

dissenting) (emphasis omitted). Further, if the majority's explanation were extended to its logical conclusion, the harmless error doctrine could eviscerate the requirement that waivers of the constitutional right to a jury trial be knowing, voluntary, and intelligent.

## III

¶ 88. Contrary to the majority, I do not believe that we are compelled by *Harvey* and *Neder* to apply a harmless error analysis in this case. The majority's application of the harmless error doctrine here extends that doctrine beyond the limited circumstances in those cases and further erodes the vitality of the constitutional right to a trial by jury.[1]

¶ 89. In *Harvey,* the defendant was charged with selling narcotics within 1,000 feet of a city park. 254 Wis. 2d 442, ¶ 2. One of the elements of the charged offense was that the park in question, Penn Park, was a state, county, city, village, or town park. The circuit court took judicial notice of the fact that Penn Park was a city park, and it directed the jury to accept that fact as true. *Id.,* ¶ 3. On review, this court applied a harmless error analysis, reasoning that "[t]he elemental fact on which the jury was improperly instructed is undisputed and indisputable: Penn Park is a city park, and no one says otherwise." *Id.,* ¶ 48.

---

[1] Additionally, I note that the test for harmless error has been stated in at least two ways by this court. In *State v. Vanmanivong,* 2003 WI 41, ¶ 35, 261 Wis. 2d 202, 661 N.W.2d 76, the court stated the test as follows: "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." By contrast, in *State v. Tucker,* 2003 WI 12, ¶ 26, 259 Wis. 2d 484, 657 N.W.2d 374, the court stated the following test: "an error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."

¶ 90. In *Neder*, the defendant was charged with tax fraud when he failed to report nearly $5 million in income which was obtained from a fraudulent real estate scheme. 527 U.S. at 6. The elements of the statute were that Neder made false statements to the IRS and that the false statements were material. The jury found that Neder knowingly and falsely reported his income, and the district court determined that Neder's false statement was material. *Id.*

¶ 91. In both *Harvey* and *Neder*, the facts that were taken from the jury without a valid waiver were not only *undisputed;* the nature of the facts at issue in Harvey and Neder made them *indisputable.*

¶ 92. In *Harvey,* the court took judicial notice of the fact that Penn Park was a city park. A court may take judicial notice of a fact only if it is "not subject to reasonable dispute." *See* Wis. Stat. § 902.01(2) ("Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute . . . .") A fact may be indisputable if it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Wis. Stat. § 902.01(2)(b).[2]

¶ 93. The kind of fact at issue in *Neder* was likewise indisputable because there can be no reasonable dispute that the failure to report $5 million in income is "material" to a charge of tax fraud. The tax fraud statute prohibited the filing of any return that the taxpayer "[did] not believe to be true and correct as to every material matter," 527 U.S. at 16, and "material

---

[2] The fact that Penn Park was a city park could be verified by consulting publications of the City of Madison Parks Division. *State v. Harvey,* 2002 WI 93, ¶ 48 n.13, 254 Wis. 2d 442, 647 N.W.2d 189.

matter" was construed to mean any information necessary for a determination of tax liability.

¶ 94. The fact of materiality was not a fact that was susceptible to formal proof, but rather, it was implicit in the finding that Neder had falsified his income. Once the jury found that Neder falsely reported his total income, the fact of materiality followed, ipso facto, from the fact the jury did find.

¶ 95. By contrast, the elemental fact at issue in this case, the weight of the marijuana, is not the kind of fact that can be determined by judicial notice. Further, it does not follow, ipso facto, from any of the facts that the jury did find. Instead, this elemental fact is the type of fact that is often disputed by defendants and could have been disputed in this case by Smith. Although Smith opted not to dispute this fact, his stipulation does not transform the nature of the fact from one that can be subject to reasonable dispute into one that is indisputable.

¶ 96. The majority contends that the distinction I make between undisputed facts and indisputable facts is unworkable. Majority op., ¶¶ 72–73. However, contrary to the majority, this distinction can be found aplenty, especially in regard to judicial notice jurisprudence. The long history and substantive case law interpreting and applying the rule of judicial notice reveal that this distinction has been employed by courts for many years. See e.g., Edmund M. Morgan, *Judicial Notice,* 57 Harvard L. Rev. 269 (1944).

¶ 97. Because the majority fails to understand the important distinction between a fact that is undisputed and a fact that is indisputable, *see* majority op., ¶ 71, it forges a new inroad on the right to a trial by jury. It permits a judge to find a fact in the jury's stead without first securing a knowing, voluntary, and intelligent

waiver of the right to a jury determination—even though the facts found by the judge could be subject to dispute.[3]

¶ 98. Rather than further eroding the right to trial by jury, the majority should take this opportunity to limit the erosion of the jury trial right. As Blackstone explained, "though begun in trifles, the precedent may gradually increase and spread to the utter disuse of juries in questions of the most momentous concern." William Blackstone, 4 *Commentaries* *350. The majority should pay heed to the warning issued by Blackstone and repeated by Justice Scalia: "However convenient intrusions on the jury right may appear at first," it should be remembered "that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters." *Neder,* 527 U.S. at 40–41 (Scalia, J., dissenting) (quoting Blackstone, *supra*).

¶ 99. I would not expand the harmless error doctrine beyond the limited circumstances at issue in *Harvey* and *Neder.*[4] Under *Harvey* and *Neder,* a harmless error analysis can be employed in circumstances

---

[3] According to the majority, my analysis implies that there would be a harmful error if Smith entered a knowing, intelligent, and voluntary waiver of his right to a jury determination of the weight of the marijuana. Majority op., ¶ 72. To the contrary, had Smith validly waived this right, there would be no error at all, and his conviction would stand.

[4] As an additional limitation, I note that the *Harvey* and *Neder* cases both involve a situation where the trial court erred by removing just one element from the jury's consideration. The *Neder* Court explained: "We have often applied harmless-error analysis to cases involving improper instructions on a single element of the offense." *Neder v. United States,* 527 U.S. 1, 9 (1999). In his dissent to the *Neder* decision, Justice Scalia wrote that under the Court's reasoning, "We know that all elements cannot be taken from the jury, and that one can." He asked,

where a trial court erroneously found a single indisputable element of the crime without obtaining the defendant's personal waiver.

## IV

¶ 100. Here, Smith personally stipulated to the facts necessary to prove the weight of the marijuana. However, he did not personally waive his right to a jury determination of this fact. As the majority contends, a knowing waiver of a jury determination of an element must be personal and must be on the record. I would remand this case to the circuit court for a determination of whether Smith knowingly, voluntarily, and intelligently waived the right to a jury determination of the weight of the marijuana.

¶ 101. At first glance, this remedy appears to be at odds with *Livingston* and *Hauk,* cases the majority asserts it need not overrule. In *Livingston,* the circuit court conducted a bench trial without securing the defendant's personal, on-the-record jury waiver. *Livingston,* 159 Wis. 2d at 565. Relying on the language of Wis. Stat. § 972.02(1),[5] this court concluded that it could not conduct a harmless error inquiry and that it would be inappropriate to remand for an assessment of whether *Livingston* knowingly, intelligently, and voluntarily waived the right to a jury trial. *Id.* at 573. Rather,

"How many is too many[?]" Without some limitation on the number of elements that can be taken from the jury, the harmless error doctrine could nullify the jury trial right. *Id.* at 33 (Scalia, J. dissenting).

[5] "Except as otherwise provided in this chapter, criminal cases shall be tried by a jury . . . unless the defendant waives a jury in writing or by statement in open court or under s. 967.08(2)(b), on the record, with the approval of the court and the consent of the state." Wis. Stat. § 972.02(1).

the *Livingston* court asserted, the only remedy under the statute was a new trial. *Id.; see also Hauk,* 257 Wis. 2d 579, ¶ 37.

¶ 102. The court's rationale in *Livingston* was based on a difference between constitutional guarantee of a jury trial and the language of Wis. Stat. § 972.02(1), which provides a procedure for waiving that right. Here, the majority's analysis casts doubt on *Livingston*'s continued vitality. Although it contends in a footnote that *Livingston* need not be overruled, it undercuts the holding of that case by concluding that a violation of the statutory procedure does not necessarily require a new trial. Majority op., ¶ 62 n.19. If *Livingston*'s interpretation of Wis. Stat. § 972.02(1) is no longer good law, a remand for an evidentiary hearing is an available remedy.

¶ 103. In this case, we cannot determine from the record whether Smith knowingly, voluntarily, and intelligently waived his right to a jury determination of the stipulated elements. *Id.,* ¶ 57. There are certain parallels between this situation and the situation at issue in a *Bangert* case, where we cannot tell from the record whether the defendant knowingly, voluntarily, and intelligently waived the right to a jury determination of guilt when entering a guilty plea. *See State v. Bangert,* 131 Wis. 2d 246, 389 N.W.2d 12 (1986). If the court cannot determine from a plea colloquy whether the defendant knowingly, intelligently, and voluntarily waived the right to a jury determination of guilt, it is appropriate to remand for a postconviction evidentiary hearing. *See id.*

¶ 104. Under this circumstance, I would remand for a postconviction evidentiary hearing. At the hearing, the circuit court would assess whether Smith knowingly, voluntarily, and intelligently waived his right to a jury determination of all elements of the crime.

¶ 105. For the reasons set forth above, I respectfully dissent.

¶ 106. I am authorized to state that CHIEF JUSTICE SHIRLEY S. ABRAHAMSON joins this dissent.