PER CURIAM.
¶ 1 Following a bench trial, Michael Cefalu was convicted of attempted theft by fraud, as a party to the crime, of property worth over $5000 but not more than $10,000. Cefalu now appeals his judgment of conviction, along with an order denying his motion for reconsideration of the guilty verdict. He argues the evidence at trial was insufficient to support his conviction, and he also contends the circuit court improperly determined that the value of the property in question exceeded $5000. We reject these arguments and affirm.
BACKGROUND
¶ 2 Cefalu is a charter fishing boat captain in the Door County area, with over thirty years of experience. The Kewaunee/Door Salmon Tournament ("the Tournament") is a fishing competition in Door and Kewaunee Counties that awards prizes to the registered anglers who catch the largest Chinook salmon by weight. In 2013, the Tournament awarded $10,000 in cash and $1500 worth of other prizes to the first-place angler, $2000 in cash to the second-place angler, and $1000 in cash to the third-place angler. The State alleges Cefalu aided and abetted an attempt to defraud the Tournament in 2013 by entering a fish with a one-pound weight concealed inside it.
¶ 3 The following evidence was introduced during Cefalu's trial to the circuit court. In July 2013, Orlynn Helt and his son, Ben Helt, chartered Cefalu's boat and participated in the Tournament.[1] The Helts were previous clients of Cefalu, having chartered his boat on multiple prior occasions. On July 20-the first day of the 2013 Tournament-Orlynn submitted a fish caught from Cefalu's boat to Tournament officials for registration. Four people were on Cefalu's boat when the fish was caught-Orlynn, Ben, Cefalu, and Cefalu's nephew.
¶ 4 Although Orlynn formally registered the fish for entry into the Tournament, evidence at trial indicated that Cefalu accompanied him to the weigh-in station and took the lead in interacting with Tournament officials. Before weighing the fish, Tournament president Gerald MacMillin used a metal detector wand to check whether there were any foreign objects inside it that might affect its weight. The wand detected metal inside the fish. MacMillin then weighed the fish, which came in at 30.27 pounds and was, at that point, the heaviest fish in the Tournament. Because the wand had detected the presence of metal, MacMillin directed Cefalu to cut the fish open. Cefalu was reluctant to do so, stating he wanted to preserve the fish for mounting. However, MacMillin cast doubt on that explanation at trial, stating it would have been possible to cut the fish open "on the back side" so that the cut would not show if the fish were mounted.
¶ 5 Cefalu ultimately agreed to cut open the fish. According to MacMillin, Cefalu initially "attempted to cut the fish" several times using a jack knife with a three- or four-inch blade, but he "couldn't seem to get his knife to cut the fish." Shannon Cressman, a fisheries technician for the United States Fish and Wildlife Service, then offered Cefalu a different knife. Emily Kurszewski, a Wisconsin Department of Natural Resources employee who happened to be at the scene, testified Cefalu used that knife to make a cut "below the pectoral fin and the ventral fin in the stomach area."
¶ 6 Although Cefalu's initial cut did not reveal any foreign objects inside the fish, MacMillin directed Cefalu to "slice further up" because the wand had detected metal closer to the fish's mouth. After Cefalu made that cut, MacMillin reached inside the fish and pulled a one-pound lead weight out of its throat. Kurszewski testified the weight was the kind that anglers attach to their lines when fishing for salmon in order "to sink the lure further down in the water column." However, the weight did not have a hole in it through which a fishing line could have been threaded. Cressman testified the absence of a hole in the weight indicated that it had never been used for fishing.
¶ 7 When MacMillin asked Cefalu how the weight came to be inside the fish, Cefalu responded that the fish "must have sucked it up off the bottom." Both Kurszewski and Cressman testified, however, that salmon are not bottom feeders. Kurszewski also testified that she had never seen a weight that large inside any of the approximately 1000 fish she had personally cut open. Cressman similarly testified she had cut open over 4000 Chinook salmon and had never "found a lead weight like that" inside. Glenn Longley, Cefalu's former first mate, concurred that he had never found a weight like the one at issue here inside a fish, despite sometimes cleaning 100 fish per week while working for Cefalu.
¶ 8 Based on the presence of the weight, MacMillin informed Cefalu that the fish was disqualified from the Tournament. According to Cressman, MacMillin also informed Cefalu that he would "be reporting this to the proper authorities." Kurszewski similarly testified that MacMillin told Cefalu he "was going to be calling the police." Cefalu then quickly filleted the fish and left the scene before police arrived.
¶ 9 Sturgeon Bay police officer Joseph Bilodeau testified he interviewed Cefalu later that day. During the interview, Cefalu denied knowing anything about the weight inside the fish. Cefalu also denied knowing where the Helts were or how Bilodeau could reach them. However, evidence was introduced at trial that Cefalu did, in fact, know the name of the hotel where the Helts were staying.
¶ 10 The circuit court ultimately issued a written decision finding Cefalu guilty of attempted theft by fraud, as a party to the crime.[2] The court further found that the value of the property Cefalu attempted to obtain exceeded $5000. Cefalu was sentenced to ten days in jail, but the court stayed that sentence pending his payment of a $2500 fine and costs. Cefalu subsequently moved for reconsideration of the court's guilty verdict, arguing the evidence was insufficient to prove that he aided and abetted an attempted theft by fraud. Cefalu also argued the court had improperly found that the value of the property in question exceeded $5000. The court denied Cefalu's reconsideration motion, and this appeal follows.
DISCUSSION
I. Sufficiency of the evidence to support Cefalu's conviction
¶ 11 On appeal, Cefalu renews his claim that the evidence presented at trial was insufficient to support his conviction. Whether the evidence was sufficient to sustain a guilty verdict is a question of law that we review independently. State v. Smith , 2012 WI 91, ¶ 24, 342 Wis. 2d 710, 817 N.W.2d 410.
¶ 12 We apply a "highly deferential" test when reviewing the sufficiency of the evidence to support a defendant's conviction. State v. Kimbrough , 2001 WI App 138, ¶ 12, 246 Wis. 2d 648, 630 N.W.2d 752. We may not substitute our judgment for that of the factfinder unless the evidence, viewed most favorably to the State and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. State v. Poellinger , 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990). We must therefore affirm "[i]f any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt," even if we believe the trier of fact should not have found guilt based on the evidence before it. Id.[3]
¶ 13 This standard applies regardless of whether a verdict is based on direct or circumstantial evidence. Id. at 503. "In reviewing the sufficiency of circumstantial evidence to support a conviction, an appellate court need not concern itself in any way with evidence which might support other theories of the crime." Id. at 507-08. Instead, we "need only decide whether the theory of guilt accepted by the trier of fact is supported by sufficient evidence to sustain the verdict rendered." Id. at 508. Moreover, the circuit court, acting as factfinder, is charged with determining the credibility of the witnesses, resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences therefrom. See id. at 503, 506.
¶ 14 The question in this case is whether the evidence at trial was sufficient to prove that Cefalu committed attempted theft by fraud, as a party to the crime. A person commits theft by fraud when he or she "[o]btains title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." WIS. STAT. § 943.20(1)(d) (2015-16).[4] Attempt, in turn, has two elements: (1) an intent to commit the crime charged; and (2) sufficient acts in furtherance of the criminal intent to demonstrate unequivocally that it was improbable the accused would desist from the crime of his or her own free will. State v. Robins , 2002 WI 65, ¶ 36, 253 Wis. 2d 298, 646 N.W.2d 287 ; see also WIS. STAT. § 939.32(3).
¶ 15 A person may be charged and convicted as a party to a crime when he or she was "concerned in the commission of a crime," even though he or she did not directly commit it. WIS. STAT. § 939.05(1). As relevant here, a person is concerned in the commission of a crime when he or she "[i]ntentionally aids and abets the commission of it." Sec. 939.05(2)(b). To prove that a defendant aided and abetted the commission of a crime, the State must establish: "(1) that the defendant undertook some conduct (either verbal or overt) that as a matter of objective fact aided another person in the execution of a crime; and (2) that the defendant had a conscious desire or intent that the conduct would in fact yield such assistance." State v. Rundle , 176 Wis. 2d 985, 990, 500 N.W.2d 916 (1993). A defendant may be convicted as a party to the crime under an aiding and abetting theory even if the person who directly committed the crime was never identified or convicted. See State v. Shears , 68 Wis. 2d 217, 240, 229 N.W.2d 103 (1975).
¶ 16 After reviewing the trial record and the circuit court's written decision, we conclude the evidence at Cefalu's trial was sufficient to support his conviction for attempted theft by fraud, as a party to the crime, under an aiding and abetting theory. The circuit court found, as a threshold matter, that someone intentionally put a weight inside the fish Orlynn entered into the Tournament. The evidence supports that finding. While Cefalu initially suggested that the fish might have swallowed the weight from the bottom of Lake Michigan, multiple witnesses testified at trial that salmon are not bottom feeders. In addition, multiple witnesses-each of whom had cut open a significant number of fish-testified they had never encountered a fish with a similar weight inside. Evidence at trial also indicated that the weight inside Orlynn's fish had never been used for fishing, as it did not have a hole through which a fishing line could have been threaded. Given all of this evidence, the circuit court reasoned it would have been an "incredible coincidence" for a weight of this type to appear inside "a large, potential prize-winning salmon, caught during [the Tournament]." The court therefore reasonably inferred that someone intentionally put the weight inside the fish.
¶ 17 Cefalu does not dispute that intentionally putting a weight inside a fish and then entering that fish into the Tournament would constitute attempted theft by fraud. By doing so, the person who placed the weight in the fish would have intentionally attempted to deceive the Tournament by making a knowingly false representation about the fish's weight, with the intent to defraud the Tournament in order to obtain its prize money. See WIS. STAT. § 943.20(1)(d). The question therefore becomes whether Cefalu aided and abetted the attempted theft by fraud-that is, whether he undertook some conduct that aided another person in the commission of the crime and had a conscious desire that his conduct would, in fact, yield such assistance. See Rundle , 176 Wis. 2d at 990.
¶ 18 The circuit court reasonably found that one of the four men on Cefalu's boat must have placed the weight inside Orlynn's fish because they were the only individuals with the motive and opportunity to do so. The court did not make any further finding as to which of the men actually put the weight in the fish. However, it is ultimately of no importance whether Cefalu, personally, put the weight inside the fish because the evidence clearly shows that he undertook other conduct that aided another person in the commission of the attempted theft by fraud. Namely, he helped to register the fish and present it for weighing, and he took the lead in interacting with Tournament officials.
¶ 19 The evidence further supports the circuit court's reasonable inference that Cefalu was aware of the weight's presence in the fish at the time of registration, and he therefore acted with a conscious desire to defraud the Tournament. The testimony at trial showed that Cefalu was reluctant to cut the fish open after MacMillin detected metal inside it. Although Cefalu initially protested that he wanted to preserve the fish for mounting, the circuit court found that was merely an "excuse," given MacMillin's testimony "that the cut could easily be made on the back side." The court also observed that fish "aren't mounted without being gutted first," which a "seasoned Captain" would know. In addition, the record shows that Cefalu promptly filleted the fish after it was disqualified from the Tournament. The court reasoned that act cast doubt on Cefalu's prior claim that he did not want to cut into the fish because he wished to preserve it for mounting.
¶ 20 The circuit court also characterized as "damning" Cefalu's assertion that the fish must have swallowed the weight from the bottom of Lake Michigan. The court found it incredible that an "innocent, knowledgeable" charter captain would provide that explanation, given the "credible evidence" that salmon are not bottom feeders. Cefalu asserts the State used expert testimony to establish that salmon are not bottom feeders, and he complains it was "unreasonable" for the court to "attribut[e] this advanced knowledge and expertise" to him. However, evidence at trial showed that Cefalu had over thirty years of experience as a charter fishing boat captain and had particular expertise in catching Chinook salmon. The court could therefore reasonably infer that Cefalu would have been familiar with Chinook salmon feeding habits.
¶ 21 The circuit court also reasonably found that Cefalu's actions after the fish was disqualified demonstrated "consciousness of guilt." Evidence at trial showed that, after MacMillin informed Cefalu he planned to call the police, Cefalu quickly filleted the fish and left the scene.[5] Cefalu later falsely told police that he did not know where the Helts could be reached. Taken together, Cefalu's evasive actions after the fish was disqualified support a reasonable inference that he knew the weight was inside the fish.
¶ 22 Moreover, the record demonstrates that Cefalu had a strong motive to attempt to defraud the Tournament by submitting a fish with a weight inside it. See Kelly v. State , 75 Wis. 2d 303, 320 n.7, 249 N.W.2d 800 (1977) (observing that the presence or absence of motive is an "evidentiary circumstance" to be weighed by the factfinder). Evidence at trial showed that, between 1983 and 2012, Tournament-winning fish ranged in weight from 23.82 pounds to 40.07 pounds. Based on evidence regarding Cefalu's past participation in the Tournament, the circuit court could reasonably infer that Cefalu knew Orlynn's fish-which weighed 30.27 pounds including the lead weight-was a potential Tournament winner. Had the fish won, Orlynn would have been entitled to $10,000 in cash and $1500 in other prizes. Although there was no direct evidence that Orlynn agreed to share any winnings with the other individuals on Cefalu's boat, MacMillin testified it was not uncommon for Tournament winners to do so. In addition, MacMillin testified Cefalu's business would have benefitted from Orlynn catching a Tournament-winning fish because Cefalu could have used that information in his promotional materials.
¶ 23 In sum, sufficient evidence was introduced at Cefalu's trial to support a conclusion that he aided and abetted an attempted theft by fraud. While Cefalu points to evidence that may have supported a different conclusion, his arguments in that regard ignore our standard of review. When assessing the sufficiency of the evidence, we must view the evidence in the light most favorable to the State and the conviction, and we may not reverse unless we can conclude, as a matter of law, that no rational trier of fact could have found guilt beyond a reasonable doubt. Poellinger , 153 Wis. 2d at 507. Here, we cannot conclude that no reasonable factfinder could have found Cefalu guilty based on the evidence introduced at trial. Although Cefalu emphasizes that the State did not produce any direct evidence of his guilt, "a finding of guilt may rest upon evidence that is entirely circumstantial," and circumstantial evidence "is oftentimes stronger and more satisfactory than direct evidence." Id. at 501. We therefore reject Cefalu's argument that the evidence was insufficient to support his conviction for attempted theft by fraud, as a party to the crime.[6]
II. Value of the property in question
¶ 24 Cefalu next argues that, even if the evidence was sufficient to support his conviction for attempted theft by fraud, the circuit court erred when determining the value of the property in question. When the State charges a defendant with theft by fraud under WIS. STAT. § 943.20(1)(d), the factfinder must determine the dollar value of the stolen property. See WIS JI-CRIMINAL 1453A (May 2006). As the value of the property increases, so do the maximum penalties for the offense. See § 943.20(3).
¶ 25 Here, the circuit court found that Cefalu, as a party to the crime, attempted to steal property worth over $5000 but not more than $10,000-a Class H felony. See WIS. STAT. § 943.20(3)(bm). Cefalu argues the court erred because, had Orlynn's fish not been disqualified from the Tournament, it ultimately would have finished in third place. The Tournament's third-place prize was only $1000. Cefalu therefore argues the attempted theft, if successful, would have deprived the Tournament of only $1000. As a result, he contends his conviction should have been a misdemeanor instead of a felony. See § 943.20(3)(a).
¶ 26 Cefalu's argument in this regard is unpersuasive. For purposes of WIS. STAT. § 943.20, the term "value" means "the market value at the time of the theft or the cost to the victim of replacing the property within a reasonable time after the theft, whichever is less."[7] Sec. 943.20(2)(d) (emphasis added). The attempted theft in this case occurred when Helt and Cefalu presented the fish to Tournament officials for registration and weighing. At that point in time-i.e., the time the attempted theft was committed-the fish was the largest entry into the Tournament. It is undisputed that the market value of the Tournament's first-place prizes was $11,500. The defense did not introduce any evidence at trial indicating that, for whatever reason, Cefalu's intent in committing the attempted theft was to win something less than first place. On this record, the circuit court could reasonably find that the value of the property Cefalu attempted to steal exceeded $5000.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

Throughout the remainder of this opinion, we refer to Orlynn and Ben Helt individually by their first names, and collectively as "the Helts."

The Honorable Peter C. Diltz presided over Cefalu's trial and issued the written decision finding him guilty. Thereafter, the Honorable David L. Weber was assigned to Cefalu's case. Judge Weber sentenced Cefalu and later denied his motion for reconsideration of the guilty verdict.

Citing State v. Hall , 271 Wis. 450, 452-53, 73 N.W.2d 585 (1955), Cefalu argues that "[i]f the trial evidence presented two or more possible inferences but there was no basis upon which the fact-finder could make a reasoned choice between them, then the evidence failed to satisfy the burden of proof." However, our supreme court has expressly recognized that Hall is no longer good law. See State v. Smith , 2012 WI 91, ¶ 29, 342 Wis. 2d 710, 817 N.W.2d 410.
The appropriate standard is instead set forth in State v. Poellinger , 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990), which states that, when the evidence could support contrary inferences, "the trier of fact is free to choose among conflicting inferences of the evidence and may, within the bounds of reason , reject that inference which is consistent with the innocence of the accused." Accordingly, when the record contains evidence supporting more than one inference, we must "accept and follow the inference drawn by the trier of fact unless the evidence on which that inference is based is incredible as a matter of law." Id. at 506-07.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

In his brief-in-chief, Cefalu asserts there was "no indication" during MacMillin's testimony that he told Cefalu law enforcement had been contacted. In his reply brief, Cefalu concedes he "was told ... that authorities were called," but he asserts MacMillin "did not specify whether the authorities were the police or simply tournament officials." Kurszewski expressly testified, however, that MacMillin told Cefalu he "was going to be calling the police." The circuit court was entitled to rely on Kurszewski's testimony in finding that Cefalu was aware MacMillin planned to contact law enforcement.

We have concluded the evidence was sufficient to support Cefalu's conviction as a party to the crime under an aiding and abetting theory. However, a defendant may also be found guilty as a party to the crime when he or she "[i]s a party to a conspiracy with another to commit [the crime]." Wis. Stat . § 939.05(2)(c). On appeal, Cefalu argues the evidence was insufficient to establish that he was a member of a conspiracy to commit an attempted theft by fraud. We need not address this argument, given our conclusion that the evidence was sufficient to convict Cefalu as a party to the crime under an aiding and abetting theory. See Turner v. Taylor , 2003 WI App 256, ¶ 1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716.

Cefalu does not develop any argument that the cost to the Tournament of replacing the property would have been less than its market value at the time of the attempted theft.
Citing State v. McNearney , 175 Wis. 2d 485, 501 N.W.2d 461 (Ct. App. 1993), Cefalu argues "the value of the property is equivalent to its redeemable value." However, the phrase "redeemable value" does not appear anywhere in McNearney , nor can it be found in the text of Wis. Stat. § 943.20. We therefore apply the statutory definition of "value" that is set forth above, rather than Cefalu's alternative definition.