**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 14, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.     2021AP1157
                 2021AP1883**

Cir. Ct. No.  2020ME305

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE CONDITION OF J. B.:

ROCK COUNTY,

    PETITIONER-RESPONDENT,

  V.

J. B.,

    RESPONDENT-APPELLANT.

APPEALS from orders of the circuit court for Rock County: DERRICK A. GRUBB and JEFFREY KUGLITSCH, Judges. *Affirmed*.

¶1     NASHOLD, J.[1]  In this consolidated appeal, "Justin"[2] challenges his commitment order and subsequent extension order.  Justin argues that the circuit court relied on inadmissible hearsay evidence of current dangerousness in the initial commitment proceeding.  I conclude that Justin forfeited this challenge and, accordingly, affirm the initial commitment order.

¶2     Justin further argues that his extension order was in error because counsel appeared on his behalf at the hearing and stipulated to the basis for recommitment.  Justin asks this court to require an affirmative waiver process for ensuring that the appearance through counsel and all such stipulations are knowing, intelligent, and voluntary.  *See State v. Smith*, 2012 WI 91, ¶54, 342 Wis. 2d 710, 817 N.W.2d 410.  I decline to do so absent any authority creating, or permitting this court to impose, such a requirement.  Accordingly, I affirm the extension order.

## BACKGROUND

¶3     On November 16, 2020, law enforcement emergently detained Justin after his father, with whom he lived, reported that Justin had not eaten or had anything to drink for four days.  Justin was taken to the emergency room at Mercy Hospital and treated for hypovolemia, dehydration, and renal function problems.  The next day, Justin was transferred to the Winnebago Mental Health Institute (WMHI).

---

[1]  These appeals are decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20).  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2]  For ease of reading, I refer to the appellant using a pseudonym rather than his initials.

¶4     That same day, the circuit court found probable cause to believe that Justin was a danger to himself or to others.  The court ordered Justin's continued detention at WMHI and involuntary medication and treatment, pending the final hearing.  The court appointed psychiatrists Marshall Bales and Leslie Taylor to examine Justin.

¶5     On November 25, 2020, the circuit court held the final hearing on Justin's involuntary commitment.  Bales testified that he had attempted to interview Justin at WMHI, but although Justin was "wide awake," he simply "stared straight ahead" and "never said one word" to Bales.  Bales described Justin's state as "elective mutism and/or possibly an element of catatonia." Therefore, Bales based his expert opinion on Justin's medical records from WMHI, the statement of detention, and "some Rock County Human Services reports"; he also spoke with Justin's father and the nurses at WMHI.

¶6     Bales testified that he believed Justin to be suffering from a mental illness:  an "[u]nspecified psychotic disorder."  Bales explained that he "would have been able to be more specific had [Justin] spoken to me."  Bales opined, however, that based on the collateral sources he reviewed and his own observations, Justin likely had paranoid schizophrenia, an illness causing "a substantial disorder of thought, mood, [and] perception."  Bales testified that Justin's condition was treatable and that Justin was a proper subject for treatment.

¶7     Bales further testified that Justin was dangerous under the statutory standards.  He described Justin's history and symptoms:

> [W]hen he will talk and when he is interactive [at WMHI],
> he is very paranoid.  And with that, he will not eat properly
> nor drink properly.  He will also get disorganized thoughts.
> Yet, at the same time, he will get very paranoid.  And this

3

has gone on for at least four years, largely untreated, and so basically, though recently, he's been eating so poorly, drinking so poorly that there was a detention. He was … catatonic and … so that's why he was detained. Yet, even during his admission, he had to be sent to the emergency room for IV fluids due to low blood volume and dehydration. So that's where I think it's gotten dangerous ….

¶8 Bales also testified that Justin would be unable to care for himself without treatment. Bales noted, "[I]t's unclear whether [Justin's] going to be able to live with his father again." Moreover, "even with parent[al] support from his father," Justin was not eating or drinking properly "to the point where it [was] medically dangerous." Bales explained,

It's estimated to be four to five days [that Justin went without eating], and then when he went to [WMHI], he continued to not eat and drink, and when he would finally allow vital signs, he had a pulse of 160, and he had to be sent to the emergency room [two days after being admitted to WMHI] for several liters of IV fluid.

Bales explained that "[t]his lack of eating and drinking is from a psychiatric reason, nothing medical like Covid or anything like that." Bales noted that Justin had been "improving" during the week he was detained at WMHI and that a nurse informed him that Justin was "beginning to eat and drink."

¶9 Thus, Bales testified that Justin was dangerous under "Standard 4" because his "mental illness impairs his judgment and behavior and his capacity to meet the demands of life." *See* WIS. STAT. § 51.20(1)(a)2.d. (an individual is dangerous where he or she "[e]vidences behavior manifested by recent acts or omissions that, due to mental illness, he or she is unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death" or serious physical

4

harm will "imminently ensue" without prompt treatment). Bales noted that other commitment standards might apply as well.

¶10 During this portion of testimony, the County asked Bales if he believed that Justin "is a danger to himself or others," and Bales responded, "There's no indication that he's been suicidal. *But his father has feared for his safety.*" (Emphasis added.) Justin's counsel objected to this testimony on hearsay grounds, since Bales had no firsthand knowledge of the father's fear for his safety. The court overruled the objection.

¶11 Bales further testified that Justin was not competent to refuse medication or treatment because he did not "appear to understand … the advantages, disadvantages, and alternatives to psychotropic medication" and did not "accept[] that he has a mental illness and that's the reason he rejects taking medications or seeking professional care." *See* WIS. STAT. § 51.61(1)(g)4. (setting forth the criteria for ordering involuntary medication and treatment). Bales explained that Justin "only takes his medications because he has to." Bales also testified that Justin "would not continue eating if he was not under a commitment order," based on "[t]he pattern." Bales explained, "When he's not getting treatment, for weeks he was not eating well, he was isolating in his father's basement, and … then I believe that with treatment, he's beginning to hydrate, to take calories, and … I just think that without treatment, he'll go back to the way he was." Bales recommended a locked inpatient psychiatric unit as the least restrictive treatment setting.

¶12 At the close of Bales's testimony, Justin's counsel objected to admitting Bales's report into evidence. Although the argument is somewhat unclear, counsel appears to have raised two separate but related grounds for the

objection. First, counsel argued that only Bales's testimony—and not his report—was the type of "evidence that should be considered by the court." Second, counsel argued that "[t]here's multiple layers … of hearsay in the report." The court overruled the objection. Counsel then noted, "I'm going to be making the same objection probably for Dr. Taylor's report." Counsel provided the court with citations to case law discussing an expert's reliance on hearsay (discussed in more detail below), and she stated that she would "make [the objection] in my closing argument."

¶13    Taylor's testimony largely echoed Bales's. Taylor explained that Justin "refused to come to the interview room," so she based her expert opinion on his WMHI records and her conversation with Justin's father. She testified that a diagnosis of schizophrenia was "appropriate" "[g]iven the history that was in the records and from his father, and then also … [Justin] was hospitalized in Chicago briefly and then he was diagnosed with schizophrenia at that time."

¶14    Taylor further testified that Justin was a danger to himself:

> Before his admission [to WMHI it] had been five days [since he ate or drank]. I don't know when he resumed eating or drinking while he was at [WMHI]. But initially, they were so concerned about him that they were giving him a diagnosis of possible catatonia, which is a life-threatening psychiatric emergency. He was refusing the treatment for that, which is Ativan. So I think they were on sort of the precipice of having to do IV fluids or IV Ativan to make sure that he wouldn't die at [WMHI].

Taylor explained that the medical emergency occurred "when [Justin] was first admitted," at which time "he was refusing to talk, he was refusing to eat or drink, and he was just kind of lying on the floor without moving."

6

¶15 Taylor also testified that WMHI had to "force[] meds because [Justin] was refusing" and that he was refusing medication "[p]rior to the order to treat." Taylor agreed with Bales's assessment that the least restrictive treatment setting was a locked inpatient psychiatric unit.

¶16 At the close of Taylor's testimony, Justin's counsel reiterated her argument that the expert reports should not be admitted into evidence. Counsel stated, "Again, just multiple levels of hearsay in the report, and we heard Dr. Taylor testify today, so her testimony in court should be the evidence considered by the court." The court overruled the objection, explaining,

> [I]t's always been the court's experience here that experts are allowed to rely on inadmissible evidence as a basis for forming their decisions and their opinions. And they put this report together at the court's instruction, and we rely on those reports …. And while I agree the testimony is relevant here, obviously, but the testimony dovetails with the report. And even though there might be some hearsay statements in there, I don't think that invalidates the entire report because the doctors, as experts, are able to use that in forming their opinions.

¶17 Justin testified as well. He explained that just before he was emergently detained, he had been "intermittently fasting" for "a few days" for "religious" reasons. He testified that he had had "reduced caloric intake" during those days but that he had continued to drink fluids. Justin testified that he experienced "unpleasant" side effects from medication and that he preferred "a holistic solution" rather than drugs. When asked if he had ever been diagnosed with a mental illness in any State, Justin responded, "Possibly, but … that's not completely certain whether it was actually a diagnosis or not." Justin admitted that he was hospitalized in another State "a year or two ago," but he could not "exactly recall" why.

¶18   In her closing argument, Justin's counsel appeared to argue that there was no non-hearsay evidence of Justin's current dangerousness. Counsel asserted that, under the case law,

> [the experts] are able to rely upon reports for their diagnosis for a mental issue, but not on the issue of dangerousness. Both doctors, they did not personally view [Justin] not eating or not drinking…. We have no evidence of any violent behavior or serious threats by [Justin] or that he's made threats to anybody else. It's solely based on [Justin's] not eating and not drinking.

¶19   The circuit court determined that, by clear and convincing evidence, Justin met the statutory criteria for commitment under WIS. STAT. § 51.20(1)(a). Specifically, regarding dangerousness, the court explained,

> The doctors indicated here [that] it was four days or so [without food or water]. And [Justin] got himself dehydrated, he got himself into a position on the day that Dr. Bales saw him that he was so dehydrated that he had to go and be treated in the emergency room … with IV fluids for dehydration, and it got so bad that his pulse rate got up to 160. And these are clearly records the doctor can rely on. That put him in a tachycardia[-]type situation, which is dangerous. And because he's not able to take care of himself … in that regard[] and is not able to satisfy his basic needs for nourishment, I believe that [the] fourth standard certainly is appropriate here.
>
> ….
>
> And again, Dr. Taylor's suggestion [was] that his impaired judgment … create[s] physical impairment or injury[.] I think the same tachycardia and dehydration, the catatonic state that he was in certainly fits the bill here. So I think clearly both the third and fourth prongs are met. Arguably, the fifth prong is [also] met.

The court further determined that Justin met the statutory criteria for involuntary medication and treatment. *See* WIS. STAT. § 51.61(1)(g)4. The court ordered

Justin to six months' locked inpatient treatment at WMHI, along with involuntary medication and treatment.

¶20    Five months later, the County petitioned to extend Justin's commitment. At the recommitment hearing, Justin appeared by counsel. Justin's counsel stipulated to a nine-month recommitment based on a new report by Taylor, who had evaluated Justin in connection with the recommitment proceeding. Counsel stipulated that Justin was dangerous under "the third or fourth standard based on [Justin's] pre-commitment behaviors." *See* WIS. STAT. § 51.20(1)(a)2.c., d. Counsel further "ask[ed] for a medication order in this matter, which is supported by the report of Dr. Taylor." The circuit court found that, based on Taylor's report, there was a sufficient basis under § 51.20(1)(a)2.c. and (am) to extend Justin's commitment. The court entered a nine-month order for recommitment and an order for medication and treatment. Justin appealed the initial commitment order and the recommitment order, and this court granted Justin's motion to consolidate the appeals.

**DISCUSSION**

*I. Principles of Law and Standards of Review.*

¶21    A county initiating a WIS. STAT. ch. 51 involuntary commitment must prove, by clear and convincing evidence, that the subject individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous under one of five statutory standards, as set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. ***Portage County v. J.W.K.***, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509; § 51.20(1)(a), (13)(e). Each of these "dangerousness" standards requires evidence of recent acts or omissions demonstrating a substantial probability of danger to the

9

individual or to others—either because the individual will directly cause injury or because the individual cannot satisfy his or her basic needs. ***Winnebago County v. S.H.***, 2020 WI App 46, ¶8, 393 Wis. 2d 511, 947 N.W.2d 761; § 51.20(1)(a)2.a.-e.

¶22 An extension proceeding requires proof of the same three elements, "except that instead of proving dangerousness under [WIS. STAT.] § 51.20(1)(a)2.a.-e., the county may rely on the 'alternative evidentiary path' of § 51.20(1)(am)." ***S.H.***, 393 Wis. 2d 511, ¶8 (quoting ***J.W.K.***, 386 Wis. 2d 672, ¶19); § 51.20(13)(g)3. Paragraph (am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior." ***J.W.K.***, 386 Wis. 2d 672, ¶19. Accordingly, the county need not point to any recent acts, omissions, or behavior, and may instead "show[] that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am).

¶23 Review of a commitment or extension order presents a mixed question of fact and law. ***S.H.***, 393 Wis. 2d 511, ¶10; ***Marathon County v. D.K.***, 2020 WI 8, ¶¶17-18, 390 Wis. 2d 50, 937 N.W.2d 901. The appellate court upholds factual findings unless clearly erroneous, but it reviews de novo whether those facts satisfy the statutory standard for recommitment. ***S.H.***, 393 Wis. 2d 511, ¶10.

## II. *Justin Forfeited His Argument that the Circuit Court Improperly Relied on Hearsay Evidence to Determine Dangerousness, and any Improper Reliance on the Reports was Harmless Error.*

¶24   Justin argues that there is insufficient evidence of current dangerousness supporting his initial commitment because most or all of the evidence on dangerousness was inadmissible hearsay.[3]  Justin acknowledges that Bales and Taylor were permitted to rely on inadmissible hearsay in forming their opinions.  *See* WIS. STAT. § 907.03.  He argues, however, that these experts impermissibly acted as conduits for the underlying information, such that the circuit court relied on numerous facts that were not properly in evidence.  *See* *State v. Coogan*, 154 Wis. 2d 387, 399-400, 453 N.W.2d 186 (Ct. App. 1990) (an expert may not "act[] as a conduit for inadmissible evidence").  Accordingly, Justin contends, the court violated his due process rights by admitting and relying on inadmissible hearsay evidence to support his commitment.

¶25   I do not reach the merits of this argument because I agree with the County that it is forfeited.  *See* *State v. Huebner*, 2000 WI 59, ¶¶10-11 & n.2, 235 Wis. 2d 486, 611 N.W.2d 727 (objections not made to the circuit court are generally deemed forfeited, and the issue will not be considered on appeal); WIS. STAT. § 901.03(1)(a) ("Error may not be predicated upon a ruling which admits … evidence unless ...  a timely objection or motion to strike appears of record, stating

---

[3]  The orders appealed from are both expired; however, Justin raises various arguments as to why his appeal is not moot or why a mootness exception applies.  *See* *Marathon County v. D.K.*, 2020 WI 8, ¶¶19, 23, 390 Wis. 2d 50, 937 N.W.2d 901.  The County agrees that this appeal is not moot and asks this court to address the merits of the appeal.  Given the County's concession, I do not address the mootness issue.  *See* *State v. Tillman*, 2005 WI App 71, ¶18, 281 Wis. 2d 157, 696 N.W.2d 574 (the appellate court's role is generally limited to addressing the issues raised by appellate counsel).

the specific ground of objection, if the specific ground was not apparent from the context.").

¶26     Justin made only one specific hearsay objection to the experts' testimony.  This occurred after Bales testified that Justin's father "has feared for his safety"; Justin objected on the grounds that Bales only knew of this fact through records and his conversation with the father.  Ultimately, however, the court did not commit Justin because he posed a danger to his father or others but because his refusing food and water had caused medical danger to himself.  Accordingly, any circuit court error in admitting Bales's testimony that Justin's father "has feared for his safety" was harmless.  *See* WIS. STAT. § 901.03(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected"); ***Martindale v. Ripp***, 2001 WI 113, ¶32, 246 Wis. 2d 67, 629 N.W.2d 698 ("For an error 'to affect the substantial rights' of a party, there must be a reasonable possibility that the error contributed to the outcome of the action or proceeding at issue.").

¶27     Aside from this one objection, and contrary to Justin's arguments on appeal, Justin did not raise any hearsay challenge to either expert's testimony.  Moreover, although Justin did object to the admission of the experts' *reports* (and reiterated this argument in closing), he did so generally, arguing that the reports contained "multiple layers" of hearsay and that, because the witnesses testified, the circuit court was precluded from relying on their reports.  Justin did not direct the court to any specific hearsay contained in the reports.[4]

---

[4] Likewise, on appeal, Justin does not point to any specific hearsay contained in the reports.

12

¶28    There are important principles supporting the forfeiture rule that are in play here. Abiding by the forfeiture rule "allow[s] circuit courts to correct errors in the first instance, provid[es] circuit courts and parties with fair notice of an error and an opportunity to object, and prevent[s] attorneys from 'sandbagging' errors by not raising them during trial and alleging reversible error upon review." *See State v. Mercado*, 2021 WI 2, ¶35, 395 Wis. 2d 296, 953 N.W.2d 337 (internal quotation marks and quoted source omitted). Had Justin objected to specific testimony or statements in the reports supporting dangerousness (for example, the experts' statements that Justin had not eaten or had anything to drink for four days), the County may have been able to introduce that evidence through other means or explain why a hearsay exception applied. It is fundamentally unfair to the County to consider objections that are raised for the first time on appeal, where a timely objection may have resulted in the admission of that evidence.

¶29    Moreover, on appeal, Justin does not separately argue that admitting the experts' reports (as opposed to the experts' testimony) caused the court to rely on inadmissible hearsay. For the sake of completeness, however, I have reviewed the reports and conclude that they largely duplicate the experts' trial testimony. In fact, generally speaking, the trial testimony is more detailed. Accordingly, I agree with the County that any error in admitting the reports was harmless. *See Martindale*, 246 Wis. 2d 67, ¶32.[5]

---

[5] Justin does not argue that any exceptions to the forfeiture rule apply. *See State v. Mercado*, 2021 WI 2, ¶37, 395 Wis. 2d 296, 953 N.W.2d 337 (a reviewing court may reverse unobjected-to errors on plain error grounds, in the interest of justice, or because of ineffective assistance of counsel). Accordingly, I do not consider any exceptions to the forfeiture rule. *See Tillman*, 281 Wis. 2d 157, ¶18.

(continued)

*III. Reversal is not Warranted Based on Justin's Counsel Appearing on Justin's Behalf and Stipulating to His Recommitment.*

¶30    Justin did not personally appear at the extension hearing and instead appeared by counsel, who stipulated to a ninth-month recommitment and a corresponding medication and treatment order.  On appeal, Justin does not argue that he was in fact denied notice or the opportunity to be personally present.  Nor does he argue that he did not consent to the stipulations or that his attorney acted contrary to his wishes in this regard.  Instead, Justin asks this court to graft onto the commitment process certain criminal law procedural safeguards (an on-the-record colloquy and/or use of a written advisement and waiver of rights form) that must occur before the individual facing commitment may waive the right to be present at the hearing or stipulate to the elements of recommitment.  *See, e.g.*, *State v. Brown*, 2006 WI 100, ¶¶23-34, 293 Wis. 2d 594, 716 N.W.2d 906 (guilty plea colloquy); *State v. Klessig*, 211 Wis. 2d 194, 206, 564 N.W.2d 716 (1997) (colloquy for waiver of the right to counsel); *State v. Smith*, 2012 WI 91, ¶¶52-57, 342 Wis. 2d 710, 817 N.W.2d 410 (the right to a jury determination of the elements of the crime must be affirmatively waived).

¶31    Justin presents no law or authority mandating such requirements in the WIS. STAT. ch. 51 context or permitting this court to create such requirements.  As such, I conclude that no error stems from the circuit court's failure to conduct the extension hearing in the manner Justin proposes.  *See* ***Young v. Young***, 124

---

In addition, because I conclude that Justin's initial commitment was proper, I do not address his argument that the invalidity of his initial commitment causes his recommitment to be invalid, including his attempt to distinguish the holding of *J.W.K.* on the effect of a prior invalid commitment order. *See Portage County v. J.W.K.*, 2019 WI 54, ¶¶15, 21-28, 386 Wis. 2d 672, 927 N.W.2d 509 (holding that the reversal of a prior extension order would not invalidate the subsequent extension order).

Wis. 2d 306, 312, 369 N.W.2d 178 (Ct. App. 1985) (this court may "refuse to consider an argument without legal authority specifically supporting the relevant propositions"). Accordingly, I affirm the extension order.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.