COURT OF APPEALS
DECISION
DATED AND FILED

September 24, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2023AP2421-CR**

Cir. Ct. No. 2020CF839

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

---

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

SONNY VINCENT LAWRENCE,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Fond du Lac County: TRICIA L. WALKER, Judge. *Affirmed.*

Before Neubauer, P.J., Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Sonny Vincent Lawrence appeals the judgment convicting him of first-degree reckless homicide/deliver drugs as party to a crime. *See* WIS. STAT. §§ 940.02(2)(a), 939.05 (2023-24).[1] He argues that the evidence was insufficient to support his conviction and that the trial court should have recused itself. We affirm.

¶2 Lawrence was charged with first-degree reckless homicide/deliver drugs as party to a crime following the death of Andrew,[2] who died of a drug overdose shortly after midnight on March 27, 2020. According to the complaint, Andrew had seven times the lethal dose of fentanyl in his system when he died, and officers who searched the residence where he died found several items consistent with drug use, including syringes and fentanyl. The complaint further alleged that Andrew, his friend Amber Schuster,[3] and Schuster's boyfriend, Scott, had purchased fentanyl from someone Schuster knew as "Sundance" on March 26, 2020, and that investigating officers had identified Sundance as Sonny Vincent Lawrence. Lawrence pled not guilty and the case proceeded to trial.

¶3 Before trial, the trial court notified the parties that the court had served as a guardian ad litem for Schuster's children in 2013. The court explained that "the only contact during that time was a single letter," and that the court had contacted the judicial ethics board and had been told that the situation did not

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

[2] This matter involves the victim of a crime. Pursuant to WIS. STAT. RULE 809.86(4), we use a pseudonym instead of the victim's name.

[3] Schuster was also charged with reckless homicide in connection with Andrew's death, and we will refer to her by name. Other lay witnesses who testified at Lawrence's trial, including Schuster's boyfriend, Andrew's girlfriend, and another friend of Andrew's, will be identified using pseudonyms.

mandate recusal. The State noted that Schuster was a key witness, but neither the State nor Lawrence asked the court to recuse itself from the case. Later, when Lawrence retained new trial counsel, the trial court told Lawrence's new attorney that the court had been a guardian at litem for Schuster's children. Lawrence's new attorney told the court that he had spoken with Lawrence and that they did not object to the court remaining on the case.

¶4     At trial, Schuster testified that on March 26, 2020, she, Scott, and Andrew drove to Milwaukee together to buy heroin from a man they knew as Sundance. Schuster, Scott, and Andrew were regular drug users, and Sundance was a dealer Schuster reached out to daily. Schuster testified that Sundance would give her a location to meet at and would arrive in a green Challenger or Charger. Schuster explained that when she bought heroin, she would sometimes receive fentanyl, which she described as "a lot stronger" and "easier to overdose" on.

¶5     Schuster testified that she and Andrew did a "shot"—which other witnesses identified as being approximately .05 grams—of the last of her personal heroin stash together in the early afternoon and then went with Scott to meet Sundance to buy more. Either Schuster or Andrew gave Sundance $100 and received drugs packaged in a paper receipt. Sundance sold them one gram of what Schuster, who later tested the drugs, discovered was fentanyl. Upon receiving the fentanyl from Sundance, Schuster and Andrew each did another shot and returned to Fond du Lac, where Andrew paid her in "a quarter," or .25 grams, for setting up the transaction. Andrew dropped off Schuster and Scott, and that is the last time either of them saw him.

¶6     Andrew's girlfriend, Nina, testified that Andrew came to her house at about 5:00 or 6:00 p.m. the evening of March 26, 2020 and brought drugs with

him. Nina assumed Andrew brought heroin because it was wrapped in foil and because he told her it was heroin.

¶7 Nina and Andrew got into an argument about the drugs; she had struggled with addiction and wanted them to stop using, but Andrew "wanted to party one last time." At about 8:00 p.m., they went together to Andrew's friend Debbie's house where Nina assumed, based on their friendship and history, that Andrew sold some of the supposed heroin to Debbie. Although Nina did not see anyone use drugs at Debbie's house, she did see Andrew and Debbie go into the bathroom together. She also saw a scale and what looked like about a half gram of heroin on the scale in the bathroom.

¶8 Andrew's friend Debbie also testified and confirmed that Andrew sold her what she believed was heroin the night of March 26, 2020. She testified that she purchased approximately four bindles that had approximately .05 grams each, and that during the transaction Andrew had with him a baggie that had what appeared to be more heroin in it. Shortly after 9:00 p.m., Andrew texted Debbie and asked her what she thought. After using some of what Andrew sold her, Debbie texted back, "I think it's good. It seems like it has a little bit of a creeper effect too." Debbie described the "creeper effect" as making her feel sedated, saying, "[I]t sneaks up on you. You shouldn't have probably done that much." Debbie testified that she felt this way after taking .05 grams of the substance and that, based on Andrew's texts back to her—which were admitted into evidence— she assumed that he had used some of what he had sold to her.

¶9 After Andrew and Nina returned from Debbie's house, Andrew left for a short time to go to another friend's house; when he returned, Nina found Andrew crying in the bathroom. Nina and Andrew began talking and reminiscing,

and Andrew pulled out two loaded syringes. Nina got nervous and left the room. When she returned, Andrew appeared to have lost consciousness. Nina attempted to revive him and called 911. Paramedics arrived and took Andrew to the hospital.

¶10 Dr. Adam Covach, the forensic pathologist who performed Andrew's autopsy, opined that Andrew's cause of death was due to "[a]mphetamine, cocaine, and fentanyl toxicity." Dr. Covach testified that Andrew's fentanyl level was 49 ng/mL (nanograms per milliliter). He explained that people being treated for cancer with fentanyl typically are in the "two to four range" and when "it hits a level of 7 to 7.5 [ng/mL], I start thinking of it as a stand alone cause of death."

¶11 Dr. Covach considered the extent to which other substances in Andrew's system contributed to his death, and testified that fentanyl was the only drug listed in Andrew's toxicology report that was within a fatal range. Dr. Covach had no reason to believe that the presence of naloxone, caffeine, or nicotine and its byproducts in Andrew were associated with his death. Dr. Covach further opined that the amounts of cocaine and amphetamine found in Andrew's system did not necessarily correlate with a potential cause of death. Dr. Covach concluded that the fentanyl, by itself, was "the most substantial factor" in Andrew's death.

¶12 Detective Vance Henning, the lead investigator of Andrew's death, testified that he found three tinfoil bindles in Nina's bedroom—two of which had a powdery substance in them that tested positive for fentanyl and one that was empty. Detective Henning also testified that three syringes were found; one plunged down as if it was used, one partially plunged down, and one that was unused.

¶13    Detective Henning interviewed Nina, Debbie, Scott, and Schuster and cross-checked Sundance's phone number with Milwaukee-area law enforcement, who told him that Lawrence was associated with that number. Henning showed Lawrence's photo to Scott and Schuster, who identified him as Sundance. Based on the data extracted from various phones, Detective Henning prepared a timeline by references to various phone calls and text messages between Andrew and Schuster, Andrew and Debbie, and Schuster and Sundance. The timeline is consistent with the testimony of Schuster, Nina, and Debbie regarding their interactions with Andrew on March 26, 2020.

¶14    Detective Henning also helped arrange a controlled buy between Scott and Lawrence. Using the same phone number that Schuster used to text Lawrence, Scott planned to purchase heroin from Lawrence at a Milwaukee-area gas station. Scott testified that Lawrence arrived in the same green Charger that he drove on March 26, 2020, that he gave Lawrence $100, and that Lawrence gave him a bag of drugs. The substance Scott purchased tested positive for fentanyl. Detective James Baranek, who assisted with the controlled buy, explained, "Heroin or fentanyl. That's kind of synonymous or mixed up with each other quite a bit now."

¶15    A jury found Lawrence guilty. He appeals.

¶16    We turn first to Lawrence's contention that the evidence was insufficient to support the verdict. Whether the evidence is sufficient to support a jury's guilty verdict is a question of law subject to de novo review. *State v. Smith*, 2012 WI 91, ¶24, 342 Wis. 2d 710, 817 N.W.2d 410. This court will uphold the verdict unless the evidence "'is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.'"

*Id.* (*quoting State v. Poellinger*, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990)). The sufficiency of the evidence test is the same regardless of whether the evidence is direct or circumstantial. *Poellinger*, 153 Wis. 2d at 501. "If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, [we] may not overturn a verdict even if [we] believe[] that the trier of fact should not have found guilt based on the evidence before it." *Id.* at 507. "[I]f more than one reasonable inference can be drawn from the evidence, we must adopt the inference that supports the verdict." *State v. Mertes*, 2008 WI App 179, ¶10, 315 Wis. 2d 756, 762 N.W.2d 813. Moreover, we consider the totality of the evidence when conducting a sufficiency of the evidence review. *See Smith*, 342 Wis. 2d 710, ¶36 (A jury is not required to "ignore the larger picture so as to focus on each piece in a vacuum and ask whether that piece standing alone supports a finding of guilt.").

¶17     To convict Lawrence under WIS. STAT. § 940.02(2)(a)1., the State had to prove:

> 1. [Lawrence] delivered a substance.
>
>     "Deliver" means to transfer something from one person to another.
>
> 2. The substance was [f]entanyl.
>
> 3. [Lawrence] knew or believed that the substance was [f]entanyl. ...
>
> 4. [Andrew] used the substance alleged to have been delivered by [Lawrence] and died as a result of that use.
>
>     This requires that use of the controlled substance was a substantial factor in causing the death.

*See id.*; *see also* WIS JI—CRIMINAL 1021 (2011).

7

¶18 In addition, because the State alleged that more than one person was involved in the delivery, the trial court also instructed the jury on party-to-a-crime liability. *See* WIS. STAT. § 939.05. The State told the jury that it was "not required that [Lawrence] deliver[] the substance directly to [Andrew]. If possession … was transferred more than once before it was used by [Andrew], each person who transferred possession of that substance has delivered it."

¶19 Lawrence argues that the evidence is insufficient because "none of the circumstantial evidence bridges the divide" between the fentanyl Lawrence delivered to Andrew and the fentanyl that actually killed him. Lawrence points to the fact that the drugs he sold to Andrew and his friends on March 26, 2020 were packaged differently than those Scott purchased during the controlled buy, and there was no comparison to determine whether the different packages of fentanyl sold were the same.

¶20 We disagree; the totality of the evidence supports Lawrence's conviction. As detailed above, testimony from Schuster and Scott as well as evidence from the controlled buy established that Lawrence delivered a substance to Andrew on March 26, 2020, and that this substance was fentanyl. The fact that the fentanyl had different packaging does not change the fact that it came from Lawrence, and that it was indeed fentanyl. Likewise, given that Schuster had contacted Lawrence numerous times to purchase heroin, and that several witnesses testified that fentanyl was often sold in lieu of heroin, the jury had ample evidence to conclude that Lawrence knew or believed he was selling fentanyl. And the testimony and circumstantial evidence shows that Andrew used the fentanyl obtained from Lawrence throughout the afternoon and evening of March 26, 2020, and that this use ultimately caused his death.

¶21 The testimony regarding Andrew's drug use in the hours leading up to his death was compelling. Schuster testified that she and Andrew each took a "shot" (or approximately .05 grams) from the gram Lawrence sold them and that Andrew paid her "in a quarter" (or .25 grams) for setting up the transaction. The jury could thus infer Andrew had a significant amount of drugs left with him as he went about his evening. Throughout the evening, Andrew had what the jury could have determined were those same drugs as he continued to socialize and sell drugs to his friends. His girlfriend Nina's testimony was particularly persuasive in detailing a situation where Andrew brought drugs to her home, and not only indicated he wanted to "party," but also brought out loaded syringes during an emotional moment. Her timeline of events also contains gaps wherein she did not directly observe Andrew use drugs but, given the circumstances and his behavior, give rise to the inference that he may have been using before or during his meetup with Debbie and/or with the friend he visited before Nina observed him crying. Furthermore, Detective Henning's phone call and text timeline coincided with the witness testimony.

¶22 Lawrence points to no testimony in the Record showing that Andrew obtained the fentanyl that fueled his evening from anyone other than himself. Lawrence sold Andrew one gram of fentanyl, Andrew used that fentanyl at least twice, (possibly four or more times given the circumstantial evidence), and Andrew's autopsy revealed that he had seven times the lethal amount of fentanyl in his system. Given the totality of this evidence, we cannot conclude that it is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *See Smith*, 342 Wis. 2d 710, ¶24; *Poellinger*, 153 Wis. 2d at 507.

9

¶23 Moreover, we will not consider Lawrence's argument that the link between his conduct and Andrew's death should have been assessed using the "but for" test laid out in ***Burrage v. United States***, 571 U.S. 204, 213 (2014), because that case is not binding on this court, *see **State v. Gary M.B.***, 2004 WI 33, ¶17, 270 Wis. 2d 62, 676 N.W.2d 475 ("Wisconsin courts are not bound by decisions of the United States Supreme Court when federal law does not govern the dispute."), and because Lawrence did not object to the trial court's instruction on causation, he therefore forfeited this challenge on appeal, *see **State v. McKellips***, 2016 WI 51, ¶47, 369 Wis. 2d 437, 881 N.W.2d 258.

¶24 Finally, we conclude that Lawrence forfeited his right to argue that the trial court should have recused itself for having served as a guardian at litem for Schuster's children for a short time in 2013. The judge disqualification statute, WIS. STAT. § 757.19, allows the parties and judge to agree to waive disqualification "after full and complete disclosure on the record of the factors creating such qualification." *See* § 757.19(3). Here, the court fully disclosed its limited involvement in a matter with Schuster's children. Neither of Lawrence's attorneys objected to the court presiding over his case at trial, and Lawrence did not raise the issue in a postconviction motion. *See **State v. Klapps***, 2021 WI App 5, ¶¶23, 29, 395 Wis. 2d 743, 954 N.W.2d 38 (2020). Therefore, we will not consider this argument on appeal.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.